**Jerry ETSHOKIN and Beem Corporation, Plaintiffs,**

v.

**TEXASGULF, INC., Canada Development Corporation, and H. Anthony Hampson, Defendants.**

**No. 82 C 6286.**

United States District Court, N.D. Illinois, E.D.

June 3, 1985.

---

**9.** In light of our disposition of the RICO claim, we need not address defendants' other arguments in support of dismissal.

William V. Johnson, Pamela L. Gellen and Andrea J. Barron, Johnson, Cusack & Bell, Ltd., Chicago, Ill., for plaintiffs.

Alan N. Salpter and James D. Brusslan, Mayer, Brown & Platt, Chicago, Ill., P.B. Konrad Knake, White & Case, New York City, for defendant Texasgulf, Inc.

Edward L. Foote, Stephen C. Schulte and John W. Stack, Winston & Strawn, Chicago, Ill., Fried, Frank, Harris, Shriver & Jacobson, New York City, for defendants Canada Development Corp. and H. Anthony Hampson.

## MEMORANDUM OPINION

PRENTICE H. MARSHALL, District Judge.

Plaintiffs, in their Revised Third Amended Complaint, charge defendants in five counts with alleged violations of the securities laws and regulations. Defendants have moved for summary judgment on two separate grounds. We will begin with the motion for summary judgment filed by Texasgulf, Inc. (Texasgulf).

### I.

Plaintiffs charge Texasgulf with making four statements which were misleading and deliberately and/or recklessly made, so that the statements operated as a fraud and deceit upon the investing public. Revised Third Amended Complaint (Complaint), ¶ 25. Central to plaintiffs' theory of recovery are the allegations that defendant H. Anthony Hampson (Hampson) was acting as a Texasgulf director during the negotiations which led to a tender offer for Texasgulf common stock. Specifically, plaintiffs allege that in February, 1981, representatives of Canada Development Corporation (Canada Development), including Hampson, began negotiations with Societe Nationale Elf Aquitaine (Societe) concerning the ultimate takeover of Texasgulf by a Societe subsidiary. Complaint, ¶ 11. During the negotiations, Hampson had access to non-public Texasgulf information by virtue of his position as a Texasgulf director. Id., ¶ 14. This non-public information, supplied by Hampson to Canada Development, was a significant factor in the negotiations. Id., ¶¶ 15–17. Hampson, in providing the non-public information for use in the negotiations, is alleged to have acted both as a Texasgulf director and as a Canada Development officer. Id., ¶ 18. Plaintiffs assert that because of the knowledge of Hampson, Texasgulf knew or with the exercise of reasonable diligence could or should have known that negotiations were underway concerning a tender offer for Texasgulf shares. Id., ¶ 19.

Texasgulf's knowledge of the negotiations is crucial to plaintiffs' claim that its press releases and statements in June, 1981 were in violation of the securities laws. There was unusual trading activity in Texasgulf stock. On June 5, 1981 the New York Stock Exchange (NYSE) suspended trading of the stock and inquired of Texasgulf whether it knew of any reason for the unusual trading activity. Texasgulf issued a press release in response to this inquiry which stated that it knew of no reason for that trading activity. Complaint, ¶¶ 20, 21. Additional inquiries were made by the NYSE, and further statements were issued by Texasgulf on June 19 and 23. Id., ¶¶ 23, 24. Plaintiffs also charge Texasgulf with responsibility for a newswire statement which appeared on or about June 18, 1981. Id., ¶ 22.

Prior to issuing the alleged misleading statements, Texasgulf inquired of Hampson and Canada Development whether Canada Development was negotiating to sell its shares in Texasgulf or whether they knew of any reason for the unusual trading activity. Complaint, ¶ 27. Plaintiffs acknowledge that Hampson and Canada Development "repeatedly denied" that Canada Development was negotiating the sale of its Texasgulf shares and that they gave Texasgulf reason to believe that Texasgulf would be advised if negotiations were undertaken. Id., ¶ 28.

Finally, plaintiffs charge Texasgulf with failing to investigate reasonably to ascertain the accuracy of its statements. Com-

plaint, ¶ 37. In our memorandum opinion of August 28, 1984, we struck this allegation as to Texasgulf. *Etshokin v. Texasgulf, Inc.*, 106 F.R.D. 320, 321 (N.D.Ill. 1984).

Texasgulf has renewed its motion for summary judgment, arguing that it lacked the mental state or scienter necessary for either a Rule 10b–5 or § 14(e) violation of the securities laws.[1] It asserts that as a matter of law Hampson's knowledge may not be imputed to Texasgulf. We have previously discussed whether the knowledge of an interlocking director may be attributed to Texasgulf. *Etshokin v. Texasgulf, Inc.*, 612 F.Supp. 1212, 1217–1219 (N.D.Ill.1984). We need not repeat that entire discussion here. The threshold question in this inquiry is whether Hampson acquired knowledge of the proposed tender offer for Texasgulf shares while acting in the course of his employment with that corporation within the scope of his authority. Plaintiffs maintain that a genuine issue of material fact exists as to whether Hampson was acting in the capacity of a Texasgulf director, which issue precludes entry of summary judgment in Texasgulf's favor.

Plaintiffs emphasize the fact that Hampson supplied certain non-public Texasgulf information which was crucial to the negotiations between Canada Development and Societe. We recognize that Hampson had access to this non-public information by virtue of his position as a director of Texasgulf. But the mere fact of access to and disclosure of this information does not establish that Hampson was acting in his capacity as a Texasgulf director. Plaintiffs have not argued that Hampson's disclosure was made at the behest of Texasgulf. Nothing in the record suggests that Texasgulf knew or approved of Hampson's disclosure of this non-public information in connection with the negotiations for the proposed tender offer. Assuming that his

disclosure was unauthorized and therefore a breach of Hampson's fiduciary duties to Texasgulf, it would be a strange result indeed to base the corporation's liability on an unauthorized disclosure by one of its directors. Plaintiffs have cited no cases which would support such a result.

Contrary to plaintiffs' assertions, we fail to see how any dispute as to the role played by the non-public Texasgulf information in the Canada Development-Societe negotiations raises a question as to whether Hampson was acting as a Texasgulf director. It is Hampson's knowledge of the proposed tender offer—rather than his disclosure of non-public information—which plaintiffs seek to impute to Texasgulf.

Plaintiffs argue that no clear line of demarcation can be drawn between Hampson's role as a Canada Development officer and his role as a Texasgulf director. From his own testimony, it is clear that Hampson had no trouble in drawing this line. First, he has stated that he carried on the negotiations with Societe "in my capacity as President and Chief Executive Officer of CDC [Canada Development], not in my capacity as Director of Texasgulf." Deposition of H. Anthony Hampson, taken in *Weintraub v. Texasgulf, Inc.*, 564 F.Supp. 1466 (S.D.N.Y.1983) (Hampson Dep. Tr.) at 47. Although the negotiations with Societe began in February, 1981, Hampson did not discuss the on-going negotiations with the Texasgulf Board of Directors at the meetings he attended in March and April, 1981. Hampson Dep. Tr. at 41. The fact that Hampson kept the negotiations with Societe a secret from the Texasgulf management is confirmed by the Minutes of the meeting of the Canada Development Board of Directors for June 25, 1981—the day that board approved the proposed tender offer and the day before the public announcement.

**1.** The first public announcement of the proposed tender offer for Texasgulf shares was made on June 26, 1981. Texasgulf asserts that it did not know of the tender offer prior to this announcement. Plaintiffs apparently concede

that absent the attribution of Hampson's knowledge to Texasgulf, they cannot show that Texasgulf had the requisite scienter to commit the alleged securities violations.

[T]he directors were strongly in favour of the concept of acquiring the Canadian assets of Texasgulf. Some directors expressed concern about the consequences of not having informed Texasgulf management beforehand of the proposed transactions.

Minutes at 6, Plaintiffs' Exhibit B.

It is also clear that the interests of Canada Development were foremost in Hampson's mind. With regard to offers to buy that corporation's shares in Texasgulf, Hampson testified that he would refer the matter first to the Canada Development Board and upon its consideration of the matter he would advise Texasgulf. Hampson Dep. Tr. at 55. That the interests of Canada Development came first is also reflected in his testimony concerning his telephone conversation with Mollison, Texasgulf's president, following the public announcement of the tender offer.

We had received an offer from Elf Aquitaine [Societe] that we thought was particularly attractive to us [Canada Development], and particularly attractive to all the shareholders, and that we intended to accept it. I sketched out the nature of the offer and the nature of the agreement.... I offered to explain in full to him and anybody else, the reasons for our thinking so.

*Id.* at 98. In concluding that conversation, Hampson remarked that he was sure "this was an unpleasant surprise." *Id.* at 99.

There is also evidence that Hampson was aware of the conflict between the interests of the two corporations. John P. Gallagher, one of the three individuals who sat on the boards of both Texasgulf and Canada Development, testified as to his reasons for not attending the Canada Development board meetings between February and June, 1981. "[W]henever there was going to be something else came [sic] up that might be a conflict of interest, I was advised by Tony Hampson that was the major item, and then I did not attend." Gallagher Dep. Tr. at 16.

Plaintiffs do not seriously seek to establish that Hampson learned of the proposed tender offer while acting as a Texasgulf director. As defendant points out, there is no evidence that Texasgulf appointed Hampson as its agent to solicit or receive tender offers for the shares of Texasgulf. Plaintiffs' reference to Hampson's "after-the-fact" statement on June 26, 1981 that he thought the proposed tender offer was "particularly attractive to all the shareholders," Hampson Dep. Tr. at 98, is inadequate support for the argument that Hampson was acting on Texasgulf's behalf during his negotiations with Societe.

Plaintiffs now assert that even if he obtained this knowledge solely while acting within the scope of his authority as an officer of Canada Development, Hampson's knowledge may still be attributed to Texasgulf. Plaintiffs cite *Scientific Holding Co., Ltd. v. Plessey, Inc.*, 510 F.2d 15 (2d Cir.1974) as supporting the general rule that knowledge acquired by the officer or agent in his private capacity is not imputable to the corporation, *unless* it is present in his mind while acting in an *official* capacity with that corporation. They then argue that while the knowledge of the proposed tender offer was present in his mind, Hampson had conversations with Mollison and attended Texasgulf board meetings, thereby acting in an official capacity as a Texasgulf director.

*Scientific Holding* is readily distinguishable from the situation before us. The controversy there related to certain amendments to a contract for the purchase of the assets of International Scientific, Ltd. (ISL) —the predecessor to Scientific Holding. Scientific Holding sought to have the amendments approved at the closing declared invalid in part because of want of authority on the part of Kovar, ISL's president, or ratification by the ISL board. At the closing Kovar made certain statements questioning his authority to approve the amendments. Kovar's knowledge was relevant to the issue of whether Scientific Holding's failure to repudiate the amendments until some four months later estopped it from challenging the amendments. Although it noted that Kovar did

not fulfill his obligation of notifying his principal as to these doubts, the court nevertheless imputed his knowledge of the amendment to the corporation.

> Even if Kovar had no authority to amend the contract, attendance at the closing was surely "within the scope of his agency" as the term is used in this context, namely, to exclude attribution of facts which came to the knowledge of the agent when acting in a purely private capacity or adversely to the principal, ... and all knowledge acquired by him at the closing thus is imputed to the corporation.

510 F.2d at 26 (citations omitted).

First, *Scientific Holding* involved knowledge acquired by the corporation's president. Under the New York law the president of a corporation engaged in the ordinary course of the corporation's business is presumed to act with authority. 510 F.2d at 23. Here Hampson was only a Texasgulf director. As a matter of law, an individual director is not the agent of the corporation or its shareholders. "He has no power of his own to act on the corporation's behalf...." 1 *Restatement (Second) of Agency* § 14C at 66 (1958).[2] And since directors have no power to bind the corporation, except when acting collectively and as a board, the great weight of authority supports the rule that "notice of facts casually acquired by individual directors, when they do not communicate their knowledge to the other directors or officers, and do not act officially in the matter, is not notice to the corporation." 3 W. Fletcher, *Cyclopedia of the Law of Private Corporations* § 808 at 55–56 (Rev. ed. 1975).

A second point distinguishing *Scientific Holding* is the fact that it was a "one corporation" situation. There the knowledge imputed to Scientific Holding was acquired by its president while acting within the scope of his agency. Here plaintiffs seek to attribute to Texasgulf the knowledge which Hampson acquired while acting as president and chief executive officer of Canada Development. In *Scientific Holding*, it was clear that Kovar had a duty to disclose the information he acquired at the closing to the corporation. The court commented on this duty: "[I]t is almost beyond belief that [he] did not recognize an imperative obligation to inform [his] principal which [he] must fulfill as soon as practicable." 510 F.2d at 26.

The rule that a corporation is charged with the knowledge which its officer or agent acquires while acting within the scope of his authority is generally based on one of two theories. The first is that the agent is presumed to have done his duty and communicated his knowledge to the corporation. The second basis is the fiction of the identity of principal and agent. 3 W. Fletcher, *Cyclopedia of the Law of Private Corporations* § 790 (Rev. ed. 1975).

The presumption that Hampson communicated his knowledge of the proposed tender offer to Texasgulf is an untenable one in the absence of a duty to disclose. Relying on *Treadway Companies, Inc. v. Care Corp.*, 638 F.2d 357, 377, 378–79 (2d Cir.1980), we previously held that the interlocking directors had no duty to inform Texasgulf of Canada Development's negotiations regarding the proposed tender offer. *Etshokin v. Texasgulf, Inc.*, 612 F.Supp. 1212, 1219 (N.D.Ill.1984).

Absent both a showing of Hampson's authority to seek out tender offers and a duty on his part to disclose any proposed tender offers, the only remaining basis for imputing his knowledge to Texasgulf is that of an identity between principal and agent. As we noted in denying defendant's first motion for summary judgment, plaintiff might be in a position to argue, after additional discovery, that Canada Development and the individual interlocking directors had substantial control of Texas-

---

**2.** Once again we must resort to general principles of law in discussing this issue. Plaintiffs contend that the law of Texas governs Hampson's substantive duties to Texasgulf. Plaintiffs'

Memorandum at 10 n. 4. However, defendant denies that it was incorporated under the laws of Texas. Answer, ¶ 6. Defendant has not advised us as to the state of its incorporation.

gulf such that their knowledge should be imputed to Texasgulf. *Etshokin v. Texasgulf, Inc.*, 612 F.Supp. 1212 (N.D.Ill.1984) at 1218. Plaintiffs in their memorandum have abandoned this theory of liability. Plaintiff's Memorandum at 2 n. 2.

The final argument which plaintiffs make is that statements made by Hampson with knowledge of their falsity supply the requisite scienter for a securities violation by Texasgulf. Plaintiffs cite first *Sundstrand Corp. v. Sun Chemical Corp.*, 553 F.2d 1033 (7th Cir.1977). That case does not support plaintiffs' position. In *Sundstrand,* the defendants were charged with certain misrepresentations in connection with the transfer to Sundstrand of an option held by Huarisa to purchase stock in Standard Kollsman Industries (SKI). SKI merged into Sun Chemical during the pendency of the litigation and Sun Chemical was substituted as a defendant. The district court found that Huarisa had conspired with SKI and other officers in making the misrepresentations. *Id.* at 1039. Sun Chemical did not contest that it was liable under a conspiracy theory as successor of SKI if Huarisa and other SKI personnel were found to have violated Rule 10b–5. *Id.* at 1040. That case contained no discussion of attribution of Huarisa's knowledge to the corporation, possibly because the false statements made by Huarisa were the same false statements which constituted the securities law violation. That is clearly not the situation here. While Hampson may have made false statements which could serve as a basis for liability under the securities laws, these false statements are not the same statements with which plaintiffs charge Texasgulf.

Plaintiffs also cite *S.E.C. v. Manor Nursing Centers, Inc.*, 458 F.2d 1082 (2d Cir.1972) for the proposition that a mental state can be imputed to a corporate defendant through its directors, officers or agents. *Manor Nursing* is a case where the court relied on the identity between the agent and his two corporations. 458 F.2d at 1089 n. 3.

■ We find no factual or legal basis to impute Hampson's knowledge to Texasgulf. As the court noted in *Weintraub v. Texasgulf, Inc.*, 564 F.Supp. 1466, 1470 (S.D.N.Y.1983):

To accept plaintiff's argument would necessarily lead to the conclusion that Section 10(b) liability would exist in any case where interlocking directorships exist and where information learned as a member [, officer or agent] of one [corporation] is not disclosed to the other corporation. Nothing in either the statute, its legislative history or the case authorities construing Section 10(b) and Rule 10b–5 remotely suggests that Section 10(b) liability may properly be predicated upon a failure to disclose information where the disclosure of that information might well be a breach of a fiduciary obligation owed to another person. The practical effect of such a holding would not only make interlocking directorships impossible, but would also be inconsistent with the underlying purpose of the securities laws which endeavor to enforce the performance of fiduciary obligations by imposing liability for their breach.

Defendant Texasgulf, Inc.'s motion for summary judgment is granted.

## II.

Plaintiffs seek to charge Hampson and Canada Development with responsibility for two groups of false statements. First, plaintiffs charge defendants with responsibility for the Texasgulf statements. They allege that Hampson's and Canada Development's repeated denials of the existence of negotiations concerning the proposed tender offer "were deliberately and/or recklessly made, with the knowledge that this information would be communicated to the investing public." Complaint, ¶ 28. The defendants' failure to take any action to correct these statements by Texasgulf was a fraud upon the investing public. *Id.,* ¶ 30.

Secondly, plaintiffs charge Canada Development with an announcement issued

June 23, 1981 on the Dow Jones Newswire. In that release, a spokesman for Canada Development is reported to have stated that "the company hasn't [any] intention of selling its 35% interest in TEXASGULF" and that it knew of no reason for the trading activity in Texasgulf stock but that it was "keeping an eye on it." Complaint, ¶ 31. Plaintiffs assert that this report was materially false and misleading, as Canada Development and Societe had reached an agreement in principle as to the terms of the tender offer and the sale of Canada Development's shares in Texasgulf. *Id.,* ¶¶ 32, 33. Canada Development also failed to correct this statement after its dissemination to the public. *Id.,* ¶ 35.

Plaintiffs' claim for damages arises out of Etshokin's activities as a market maker as Beem's nominee. From February 1, 1981 through June 26, 1981, Etshokin's trading of call options on Texasgulf common stock placed him in an increasing "short" position. Etshokin's trading position was based on his belief that Texasgulf was not a likely target of a tender offer. Complaint, ¶ 10. Plaintiffs assert that if Etshokin had known of the negotiations between Canada Development and Societe, he would not have taken the positions he took with respect to his trading activity. *Id.,* ¶ 13. When the market price of Texasgulf stock rose as a result of the tender offer, Etshokin was forced to cover the options he had sold. Plaintiffs allege that the covering purchases for these options totalled $1,259,079.25. *Id.,* ¶ 38.

Defendants Hampson and Canada Development have moved for summary judgment, arguing that Etshokin as a net purchaser of Texasgulf call options and common stock during the relevant time period realized a profit in excess of $234,000 and therefore incurred no compensable damages. Before reaching the question of plaintiffs' damages, if any, we must consider whether these defendants are liable under the securities law for either set of false statements, and whether Etshokin's trading during the relevant period of time is consistent with the allegations of the complaint that he relied on the false statements.

## A. Liability for the June 23, 1981 Dow Jones News Story

Defendants begin by explaining the circumstances surrounding the June 23, 1981 news story. On that day a reporter from Dow Jones called James A. Smith, Canada Development's Manager of Public Relations. Smith assumed that the call concerned the corporation's acquisition of Sentrol Systems Ltd., and referred it to Mr. Tam Deachman. Apparently Mr. Deachman had been given only a short, ten-minute briefing concerning Canada Development's plans for its Texasgulf shares. Deachman's response to the Dow Jones inquiry was in the negative.

The story issued on the Dow Jones news wire was as follows:

-0- 1 02 PM EDT JUNE 23–81

-CANADA DEVELOPMENT HAS NO PLANS TO SELL TEXASGULF STAKE

TORONTO -D- A SPOKESMAN FOR CANADA DEVELOPMENT CORP SAID THE COMPANY HASN'T ANY INTENTION OF SELLING ITS 35 PC INTEREST IN TEXASGULF INC.

'THESE RUMORS HAVE BEEN FLOATING AROUND FOR A LONG TIME' THE SPOKESMAN SAID ADDING THAT CANADA DEVELOPMENT WAS INTERESTED IN KNOWING THE REASON FOR THE TRADING ACTIVITY IN TEXASGULF STOCK TODAY. 'WE'RE JUST KEEPING OUR EYE ON IT' HE SAID.

-0- 1 03 PM EDT JUNE 23–81

Raab Affidavit, Exhibit G. While they do not argue that its statements to the Dow Jones reporter were unauthorized, defendants state that less than one hour after the story appeared on the news wire, Smith called the Dow Jones Toronto Office. Dow Jones was advised that the corporation had a policy not to comment upon rumors, and that Canada Development's position on the Texasgulf rumor was "no comment." Dow Jones apparently took no action as a result of Smith's call. Dow Jones' position, as

reported by Canada Development, was that unless the corporation confirmed that the story was false, they would do nothing about it. Response of Canada Development Corporation to Certain Inquiries of the Securities and Exchange Commission at AO–041, Plaintiffs' Exhibit G. Defendants have not advised us of any public statements which they issued to correct the allegedly misleading Dow Jones report of June 23, 1981.

Rather, defendants argue that they had no duty to disclose their negotiations with Societe prior to June 26, 1981, the date on which they reached agreement. They cite *Chiarella v. United States*, 445 U.S. 222, 235, 100 S.Ct. 1108, 1118, 63 L.Ed.2d 348 (1980), for the proposition that "[w]hen an allegation of fraud is based upon nondisclosure, there can be no fraud absent a duty to speak." Canada Development asserts that as a shareholder of Texasgulf it is under no duty to disclose its negotiations with Societe concerning the possible tender offer. *Treadway Companies, Inc. v. Care Corp.*, 638 F.2d 357, 376–78 (2d Cir.1980). And in *Wellman v. Dickinson*, 475 F.Supp. 783, 835 (S.D.N.Y.1979), the court held that Dickinson, a majority shareholder, did not violate § 10(b) when he failed to advise other shareholders that he was receiving a premium for his shares. The mere fact that a shareholder participates in a transaction which favors him does not, in itself, constitute a violation of the securities laws.

■■■ We agree with defendants that no duty to disclose was created by the fact that Canada Development was the largest single shareholder of Texasgulf. Rather, the duty to disclose on the part of Canada Development arose here from its alleged affirmative misrepresentations. As the

Fifth Circuit notes in *First Virginia Bankshares v. Benson*, 559 F.2d 1307, 1317 (5th Cir.1977), *cert. denied*, 435 U.S. 952, 98 S.Ct. 1580, 55 L.Ed.2d 802 (1978), under Rule 10b–5 "a duty to speak the full truth arises when a defendant undertakes to say anything." Here Canada Development chose to respond to the inquiries of a Dow Jones reporter. A jury might infer that Canada Development had knowledge that its comments would be made public. And a jury might also infer from their efforts in seeking a retraction that officials of Canada Development knew that the Dow Jones newswire story was misleading.

**B. Liability for the Texasgulf Statements**

Plaintiffs charge defendants Hampson and Canada Development with responsibility for the four allegedly misleading statements of Texasgulf. They allege that prior to issuing its statements, Texasgulf inquired of defendants, on numerous occasions whether Canada Development was negotiating for the sale of its Texasgulf shares and whether they knew of any reason for the unusual trading activity. Complaint, ¶ 27. Hampson and Canada Development are alleged to have repeatedly denied the existence of the negotiations concerning the sale of that corporation's Texasgulf shares. Plaintiffs assert that the Texasgulf statements were based in part on these defendants' misstatements. *Id.*, ¶¶ 28, 29.

Hampson and Canada Development may be liable for at least two of the four Texasgulf statements.[3] In response to inquiries by the NYSE, Texasgulf issued press re-

---

**3.** We doubt that plaintiffs will be able to establish Hampson's and Canada Development's connection to and liability for the June 18, 1981 statement. First, we have previously found that Mollison's statements at the securities analysts' meeting could not be the basis for a securities fraud claim. *Etshokin v. Texasgulf, Inc.*, 612 F.Supp. 1212 (N.D.Ill.1984) at 1214–1215. The parties have now supplied us with two different reports following the June 18, 1981 analysts' meeting. Raab Affidavit, second Exhibit A

(Wall Street Journal and Dow Jones News Wire); plaintiffs' Motion to File Additional Exhibit (Reuters Wire Service). We have reviewed both versions and find no reference either to Canada Development's intentions to sell its Texasgulf shares or to any rumors of a pending tender offer. The statement reported in Reuters refers to Texasgulf's predictions as to future earnings. And in the Wall Street Journal news wire story Texasgulf also comments on metal prices.

leases on both June 5 and June 23, 1981,[4] stating that "it knew of no reason for the [unusual] trading activity in the company's stock." Raab Affidavit, Exhibit D (June 5, 1981 statement). *See* Exhibit E for June 23, 1981 statement. The evidence shows at least one conversation between Texasgulf and defendants prior to the June 4, 1981 statement. Mollison, Texasgulf's president, testified that on June 2, 1981 he had a private conversation with defendant Hampson concerning the unusual trading activity in Texasgulf stock. Mollison Dep. Tr. at 15. Without searching the record, we assume that Hampson denied the existence of the negotiations at this point in time. This fact alone does not establish defendants' liability. In order to prevail, plaintiffs must prove two elements in addition to Hampson's misleading denial: first, that Texasgulf relied upon Hampson's response in issuing its press release, and second, that Hampson made this denial with knowledge that Texasgulf intended to issue a public statement.

■ That an issuer—or in this case a shareholder—is under no obligation to disclose pending negotiations prior to the point at which the parties reach an agreement in principle, *see, e.g., Reiss v. Pan American World Airways, Inc.*, 711 F.2d 11, 14 (2d Cir.1983), does not shield defendants from liability. We have reviewed the cases cited by Hampson and Canada Development for the proposition that no disclosure was required prior to June 26, 1981, the date on which Canada Development reached an agreement in principle with Societe. While the cases support the stated proposition, they are of little help here, for defendants' duty to disclose arises from Hampson's allegedly false denials of the existence of the negotiations. The courts have distinguished between a failure to disclose where no duty to speak existed and silence following affirmative misrepresentations. *See, e.g., Treadway Companies, Inc.*, 638 F.2d at 379.

4. Plaintiffs also allege that there was an intervening inquiry by the NYSE on June 19, 1981 to which Texasgulf responded. Defendants have not been able to find a record of this alleged

## C. Materiality of the Existence of Negotiations

Defendants argue that information regarding the pending negotiations between Canada Development and Societe is not material as a matter of law, so that no disclosure is required. As the Third Circuit noted in *Staffin v. Greenberg*, 672 F.2d 1196, 1206 (3d Cir.1982), "[t]he reason that preliminary merger discussions are immaterial as a matter of law is that disclosure of them may itself be misleading." Defendants assert that disclosure may be required only when an agreement in principle has been reached.

Plaintiffs focus only on this last point in arguing that an issue of fact remains as to when an agreement in principle was reached between Canada Development and Societe. We need not consider this point, for we have found a duty to disclose based on Hampson's affirmative misrepresentations, rather than on the conclusion of the Canada Development-Societe negotiations.

Materiality cannot be assessed in a vacuum. The general standard of materiality was set forth in *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976):

> An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote.... What the standard does contemplate is a showing of substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder.

Two circumstances which defendants have seemingly ignored in their discussion of materiality are the unusual activity in the trading of Texasgulf stock and Texasgulf's denials of any knowledge of the reasons for this activity. Under all the circum-

statement. A question of fact exists as to whether Texasgulf's statement was disseminated to the public.

stances in this case, we cannot say that as a matter of law the existence of the negotiations between Canada Development and Societe is not material.

We are aware of the Third Circuit's recent decision in *Greenfield v. Heublein, Inc.*, 742 F.2d 751 (3d Cir.1984). The alleged false statement in that case was virtually identical to the Texasgulf statements of June 5 and 23, 1981. "A spokesman for Heublein, Inc. said the Company was aware of no reason that would explain the activity in its stock on trading on the NYSE today." 742 F.2d at 738. The court concluded that this statement "was not false, inaccurate, or misleading." 742 F.2d at 759. *Greenfield* would thus provide an additional basis for dismissing the action against Texasgulf. But Hampson and Canada Development may not benefit here from *Greenfield*'s holding that Heublein was never under a duty to disclose prior to the agreement on the merger price. The existence of the negotiations did not give rise to the duty of disclosure here.

### D. Liability for the Use of Non-Public Texasgulf Information

■ In arguing, in the alternative, for a disclosure requirement based on the use of "inside" information, plaintiffs rely primarily on *Cady, Roberts & Co.*, 40 S.E.C. 907 (1961), and *Chiarella v. United States*, 445 U.S. 222, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980). Simply stated, they argue that because it used certain non-public Texasgulf information in its negotiations with Societe, Canada Development was required to disclose the existence of those negotiations.

We find that no duty to disclose to the investing public arises under the situation described above. The "disclose or abstain" rule of *S.E.C. v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 851–52 (2d Cir.1968) (en banc), *cert. denied*, 394 U.S. 976, 89 S.Ct.

1454, 22 L.Ed.2d 756 (1969) has been codified in Rule 14e–3. 17 C.F.R. § 240.14e–3 (1984). That rule was drafted by the Securities and Exchange Commission after the decision in *Chiarella* in order to impose liability upon any person who trades without prior disclosure of the inside information. 45 Fed.Reg. 60415 (1980). The Court in *Chiarella* had reversed the defendant's criminal conviction because as a "complete stranger" to the sellers of the target company's securities, Chiarella was under no duty to disclose. 445 U.S. at 232–33, 100 S.Ct. at 1117. The Court was unwilling to recognize "a general duty between all participants in market transactions to forgo actions based on material, nonpublic information." *Id.* at 233, 100 S.Ct. at 1117.

Careful examination of Rule 14e–3 reveals the major flaw in plaintiffs' theory.[5] That rule provides:

(a) If any person has taken a substantial step or steps to commence ... a tender offer ... it shall constitute a fraudulent, deceptive or manipulative act or practice ... for any other person who is in possession of *material information relating to such tender offer* which information he knows or has reason to know if nonpublic ... to purchase or sell or caused to be purchased or sold any of such securities ..., unless within a reasonable time prior to any purchase or sale *such information* and its source are publicly disclosed by press release or otherwise.

17 C.F.R. § 240.14e–3 (emphasis added). A reasonable interpretation of this rule is that the information to be disclosed is the material information upon which the trader relied. The non-public Texasgulf information which Canada Development used in its negotiations with Societe concerned the value of Texasgulf's holdings in Canada. Plaintiffs do not seek the disclosure of that

---

**5.** A second flaw in plaintiff's alternate theory concerns the timing of Canada Development's purchase or sale in violation of the rule. From the record before us, we know that the first public announcement of Societe's tender offer was June 26, 1981. We have not searched the record to determine on what date Canada Devel-

opment consummated its sale of Texasgulf stock to Societe. It may very well be that the public disclosure of June 26, 1981 was "within a reasonable time" of this sale. Plaintiffs have not suggested that defendants are liable in any way because of Societe's tender offer.

information; nor have they argued that disclosure of Texasgulf's Canadian holdings would have affected the price of Texasgulf stock. *Cf., Cady, Roberts & Co.*, 40 S.E.C. at 911–92 (broker traded upon receiving non-public information as to company's dividend action; reduction of dividend could be expected to have adverse impact on market price of company's stock). Rather, plaintiffs here seek the disclosure of the existence of the negotiations themselves. Such a requirement would be an unreasonable construction of Rule 14e–3 and an unjustified extension of existing case law.

### E. Plaintiff Etshokin's Reliance on the False Statements

■ Defendants have analyzed and summarized certain trading records of Etshokin, Rialcor Securities Corporation, and the Chicago Board Options Exchange Department of Surveillance. Affidavit of Stewart J. Kahn, ¶ 2. They argue first that plaintiff Etshokin's "short" position in Texasgulf shares was established prior to the first allegedly false press release on June 5, 1981. According to defendants' analysis, Etshokin was a net purchaser of both call options and stock in the period from June 5 to June 26, 1981 (the date of the public announcement of the tender offer). Defendants assert that Etshokin's gradual reduction of his "short" position during this period of time is inconsistent with his allegations of reliance.

Plaintiff Etshokin responds that he reasonably believed each statement made by the defendants and that these statements reinforced his theory that Texasgulf would not be the target of a tender offer. Plaintiffs' expert, Martin O'Connell, has testified that Etshokin's trading activities were consistent with his stated position that Texasgulf was not a likely takeover candidate. O'Connell Dep. Tr. at 204.

A genuine issue of material fact exists as to whether Etshokin's trading in the period from June 5 to June 26, 1981 is consistent with the allegations of the complaint that he relied on defendants' allegedly false statements. Assuming that Etshokin can establish his reliance upon defendants' allegedly false statements and omissions, a question remains whether plaintiffs are entitled to any damages.

### F. Plaintiffs' Damages

Plaintiffs' claim for damages arises out of Etshokin's trading, as a market maker, of call options in Texasgulf common stock. From February 1, 1981 through June 26, 1981, Etshokin maintained a "short" position in these call options. Complaint, ¶ 10. The market price of Texasgulf stock rose after the public announcement of the tender offer. And Etshokin was forced to cover the options he had sold. Plaintiffs allege that the covering purchases for the options sold from February 1, 1981 to June 26, 1981 totaled $1,259,079.25. *Id.*, ¶ 38. Etshokin also alleges that he has paid over $100,000 in interest on loans he was forced to take out to cover his losses. *Id.*, ¶ 39.

Defendants Hampson and Canada Development rely on their analysis of Etshokin's trading records to support their argument that because Etshokin was a net purchaser of call options, plaintiffs incurred no compensable damages from June 5 to June 26, 1981. Defendants also dispute plaintiffs' claim for losses attributable to call options sold prior to June 5, 1981, which options were exercised following announcement of the tender offer. Neither party has addressed Etshokin's claim for interest in this motion for summary judgment.

### 1. Damages for Call Options Sold Prior to June 5, 1981

■ Etshokin alleges that had he known of the pending negotiations between Canada Development and Societe, he would not have taken the position he took with respect to his trading in Texasgulf call options. Complaint, ¶ 13. Absent knowledge of the pending tender offer, he maintained his "short" position in call options. Had he known of the negotiations, Etshokin could have reduced his "short" position through the purchase of additional Texasgulf shares or call options. Defendants argue

that Etshokin's "mere retention" of a security position does not constitute a "purchase" or "sale," so that plaintiffs do not state a claim under *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975).

Plaintiffs, for their part, assert that Etshokin is entitled to recover *all* of his losses and should not be restricted to losses on actual trades made during the period of June 5 to June 26, 1981. Because of his unique position as a market maker, Etshokin's maintenance of his "short" position, in plaintiffs' view, is a positive investment decision—the equivalent of a "purchase" or "sale." Plaintiffs urge us to make a distinction between the market maker and the ordinary investor and allow Etshokin to recover for *all* of his losses.

Etshokin, as a market maker who maintained a position in Texasgulf call options, fails to state a claim under the securities laws for losses attributable to his pre-June 5, 1981 sales under *Blue Chip.* His position is analogous to that of an actual shareholder who "allege[s] that [he] decided not to sell [his] shares because of an unduly rosy representation or a failure to disclose unfavorable material." 421 U.S. at 737-38, 95 S.Ct. at 1926.

Plaintiffs articulate no basis upon which to hold defendants liable for losses attributable to Etshokin's pre-June 5, 1981 "short" position. Any duty of disclosure on the part of defendants arose here because of Hampson's and Canada Development's alleged misrepresentations. No duty arose from Canada Development's shareholder status or from the mere existence of the negotiations between Canada Development and Societe. Assuming that plaintiffs can establish all the necessary elements, the first act for which defendants can be held liable under Rule 10b–5 occurred on June 5, 1981, when Texasgulf issued its first allegedly misleading press release. Absent a clear duty to disclose prior to that date, Etshokin should not recover a windfall by virtue of his position as a market maker.

Plaintiffs are therefore limited in their damage claim to losses attributable to Etshokin's trades between June 5 and June 26, 1981.

### 2. Damages for Call Options Sold Between June 5 and June 26, 1981

 Defendants rely on their summaries of Etshokin's trading records to support their argument that plaintiffs have incurred no compensable damages for losses traceable to Etshokin's trading of Texasgulf call options from June 5 to June 26, 1981. Plaintiffs first assert that these summaries are not evidence and may not form the basis for the granting of summary judgment.

We disagree and find that defendants' summaries are admissible. Under Fed.R. Civ.P. 56(e), a motion for summary judgment may be supported by affidavits "made on personal knowledge, [which] set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." The affidavit of Stewart J. Kahn, a partner in the accounting firm of Arthur Andersen & Co., and the preparer of defendants' summaries, clearly meets the requirement of this rule. The admissibility of charts and summaries is specifically addressed in the Federal Rules of Evidence.

> The contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation. The originals, or duplicates, shall be made available for examination or copying, or both, by other parties at reasonable time and place. The court may order that they be produced in court.

Fed.R.Evid. 1006. Defendants have provided the court with copies of the records reviewed by Mr. Kahn in preparing his charts. Raab Affidavit, Exhibits J and K. Summaries cannot be used to circumvent the inadmissibility of the documents which they condense. But here there is no question that the trading records of Etshokin

and Railcor Securities Corporation would be admissible as business records under Fed.R.Evid. 803(6). The study prepared by the Chicago Board Options Exchange Department is itself a summary of other records which the Board keeps in the course of its business. Some additional foundation might be required before those records would be admissible. Plaintiffs have had an ample opportunity to inspect the record and properly raise any objections to the summaries' admissibility. *See Case & Co., Inc. v. Board of Trade of City of Chicago,* 523 F.2d 355, 361 (7th Cir. 1975).

Plaintiffs' counsel have half-heartedly argued that the summaries "are not necessarily correct." They point to only one instance in which they were unable to duplicate defendants' figures.[6] Their objection is without merit. We have reviewed the records submitted by defendants. It is difficult to duplicate defendants' figures of Etshokin's daily trades because they are recorded on the settlement dates, rather than on the dates the trades took place. Despite this difficulty, it is clear that the records support defendants' contention that Etshokin was a net purchaser.

Plaintiffs' objection also fails to meet the requirements of Fed.R.Civ.P. 56(e). "When a motion for summary judgment is made and supported [by affidavits,] an adverse party may not rest upon mere allegations or denials in his pleadings, but his response ... must set forth specific facts showing that there is a genuine issue for trial." Plaintiffs have failed to make such a showing. Their mere assertion that de-

fendants' charts were "not necessarily correct" is plainly inadequate.

The fact that Etshokin was a net purchaser of Texasgulf call options during the relevant trading period is significant in light of the limitation on damages contained in Section 28(a). "[N]o person permitted to maintain a suit for damages under the provisions of this chapter shall recover, through satisfaction of judgment in one or more actions, a total amount in excess of his actual damages on account of the act complained of." 15 U.S.C. § 78bb(a) (1982).

The question before us is whether plaintiffs are required to deduct from their "covering" losses any profits attributable to the Texasgulf call options purchased between June 5 and June 26, 1981. Or phrased another way, do Etshokin's purchases of call options cancel out all his sales during the relevant time period, so that plaintiffs have incurred no compensable loss? We think the fact that Etshokin purchased more call options than he sold is more important here than any profit or loss he sustained during the trading period of June 5 to June 26, 1981, because plaintiffs' complaint seeks damages for Etshokin's covering losses.[7] As we understand the call options market, Etshokin's purchase contracts could be used to eliminate or settle his "short" position.

Etshokin is in the unique position of being both a purchaser and seller of Texasgulf call options during the relevant trading period. We have found no cases which directly address the measure of damages in

---

**6.** The one example cited by plaintiffs concerns Etshokin's purchase and sale of Texasgulf common stock. Plaintiffs do not contest the validity of defendants' conclusion on Etshokin's trading of call options: namely, that during the period from June 5 to June 26, 1981 Etshokin purchased more call options than he sold. The mere allegation that Kahn's charts *may be* inaccurate with regard to Etshokin's stock purchases is of little consequence on the subject of damages. Plaintiffs claim losses for the covering purchases for the call options and for Etshokin's interest payments. Complaint, ¶¶ 38, 39. Plaintiffs do not base any claim for damages on Etshokin's ownership of Texasgulf stock.

**7.** In their brief plaintiffs argue that Etshokin's actual damages are equal to the difference between the amount he lost and what he would have lost had defendants not made any material misstatements or omissions. We are not certain to what extent this argument differs from the damage claim set forth in the complaint. Plaintiffs' expert, Martin O'Connell, made certain calculations as to what it would have cost Etshokin "to take his position off." One immediately apparent problem with Mr. O'Connell's testimony is that he necessarily assumed that plaintiffs could recover for losses attributable to Etshokin's "short" position prior to June 5, 1981.

this particular fact situation. One closely analogous case discussed the measure of damages in connection with an investment partnership. *Abrahamson v. Fleschner,* 392 F.Supp. 740 (S.D.N.Y.1975), *modified,* 568 F.2d 862 (2d Cir.1977), *cert. denied,* 436 U.S. 913, 98 S.Ct. 2253, 56 L.Ed.2d 414 (1976). Plaintiffs brought suit alleging violations of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and of Section 206 of the Investment Advisers Act of 1940, 15 U.S.C. § 80b–6. Plaintiffs complained that defendants concealed their trading of unregistered and restricted securities. Plaintiffs sought damages for their losses upon the sale of their limited partnership interest in the investment fund. Defendants argued that plaintiffs' interim withdrawals from the fund had exceeded their capital contributions, so that they had incurred no loss. Plaintiffs argued that certain payments they received could be ignored in computing damages. The district court disagreed.

It is unnecessary to decide the proper characterization of some or even all of the withdrawals, for all payments to plaintiffs, be they considered dividends or interest, must be counted in determining the amount of actual loss that can be recovered in Section 10(b) litigation.

392 F.Supp. at 745. The district court granted defendants' motion for summary judgment, finding that plaintiffs had shown no damages compensable under either § 10(b) or § 206.

The Second Circuit reversed with regard to plaintiffs' Investment Advisers' Act claim. In discussing the proper measure of damages under that Act, the court stated:

This is not to say, however, that a plaintiff may recover for losses, but ignore his profits, where both result from a *single* wrong.... The proper measure of damages then would be that part of net losses incurred on unregistered securities after the point when the defendants' representations became fraudulent which stems from the portion of those investments inconsistent with defendants' representations.

568 F.2d at 878–79 (emphasis in original; footnote omitted).

■ In discussing the issue of damages, plaintiffs here have ignored Etshokin's profits from both his daily trading of options and the exercise of the Texasgulf call options which he held. They cite no cases in support of their argument that Etshokin should be entitled to recover all of his losses by virtue of his position as a market maker. Defendants' charts establish that Etshokin's daily trading of call options during the period of June 5 to June 26, 1981 resulted in a profit and in an improved position in Texasgulf call options as measured by the market value of his net position. We find that plaintiffs incurred no compensable damages for losses attributable to Etshokin's trading of call options between June 5 and June 26, 1981.

### 3. Damages for Interest Payments

Etshokin also claims in excess of $100,000 in interest paid on loans he was forced to take out to cover his losses. Complaint, ¶ 39. This element of damage falls in the area of consequential damages. Neither party has addressed the question of Etshokin's entitlement to these damages. But having decided that plaintiffs have no compensable damages under the securities laws, we need not consider the question of consequential damages.

### 4. Common Law Fraud

In Counts II and III of the complaint, plaintiffs seek damages from defendants Hampson and Canada Development for common law fraud. These counts fall with plaintiffs' claim for damages under the federal securities laws.

[S]ection 28(a) of the 1934 Act limits recovery to single damages. Although common law remedies are expressly preserved, the conclusion is unavoidable that common law damage rules permitting recovery in excess of actual damages have not been saved.

*Schaefer v. First National Bank of Lincolnwood,* 326 F.Supp. 1186, 1193 (N.D.Ill. 1970).

Defendants' motions for summary judgment are granted. Judgment will enter dismissing plaintiffs' action.