786 F.2d 741
 54 USLW 2516, Fed. Sec. L. Rep. P 92,529,
5 Fed.R.Serv.3d 118
 Max L. LEVINSON; Karl Zuckerman; Ronald M. Newman,
Plaintiffs-Appellants (84- 3730),
Plaintiffs-Appellees (84-3775/76),
v.
BASIC INCORPORATED, Defendant-Appellee (84-3730),
Defendant-Appellant (84- 3775),
Anthony M. Caito; Samuel Eels, Jr.; John A. Gelbach;
Harley C. Lee; Matthew J. Ludwig; Max Muller; H. Chapman
Rose; Edmund G. Sylvester and John C. Wilson, Jr.,
Defendants-Appellees (84-3730), Defendants-Appellants (84-3776).
 Nos. 84-3730, 84-3775 and 84-3776.
 United States Court of Appeals,
Sixth Circuit.
 Argued Nov. 6, 1985.
Decided March 27, 1986.
Rehearing and Rehearing En Banc Denied June 19, 1986 in No. 84-3730.
 
 Joel W. Sternman (argued), Arnold I. Roth, Rosenman, Colin, Freund, Lewis & Cohen, New York City, Katherine Blakeley, William D. Ginn, Thompson, Hine & Flory, Cleveland, Ohio, for Basic Inc.
 Wayne A. Cross (argued), Reboul, MacMurray, Hewitt, Maynard & Kristol, New York City, David S. Elkind, for plaintiffs.
 Securities & Exchange Com'n, Jacob H. Stillman, Eric Summergrad, Washington, D.C., for amicus curiae.
 Norman S. Jeavons, H. Stephen Madsen, Sandra J. Brantley, Baker & Hostetler, Cleveland, Ohio, for Anthony M. Caito et al.
 Before MARTIN, JONES and WELLFORD, Circuit Judges.
 BOYCE F. MARTIN, Jr., Circuit Judge.
 
 FACTUAL BACKGROUND
 
 1
 This securities case presents two large legal questions which must be decided in the context of a multitude of small facts. The facts tell the story of contacts and discussions between officials of Basic Incorporated and Combustion Engineering, Incorporated, which eventually led to the merger of these two publicly traded corporations. In this setting, we are called upon to analyze the propriety of a summary judgment given to the defendants upon a finding that section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 were not violated by representatives of Basic when they made certain public statements. We also must examine the class certification made by the district court.
 
 
 2
 The named plaintiffs are Max L. Levinson, Karl Zuckerman and Ronald M. Newman, representing all other shareholders who sold Basic Incorporated common stock between October 21, 1977, and December 15, 1978. They claim that they relied, to their detriment, on three statements issued by Basic during that time which denied that any merger discussions were occurring. They claim that these statements were false and misleading because merger discussions were in fact occurring; and thus, the defendants violated section 10(b) and Rule 10b-5. The plaintiffs claim that they sustained substantial losses because they relied on the statements and sold their shares of Basic at an artificially low price. They seek recovery of their losses from Basic as well as from Anthony M. Caito, Samuel Eels, Jr., John A. Gelbach, Harley C. Lee, Matthew J. Ludwig, Max Muller, H. Chapman Rose, Edmund G. Sylvester and John C. Wilson, Jr.--all officers or directors of Basic.
 
 
 3
 Two rulings of the district court have been appealed upon a voluminous and rather detailed record. First, the district court granted summary judgment for the defendants based upon a finding that the statements, as a matter of law, were not material and therefore not false and misleading and that, as a matter of law, the defendants did not act with scienter. Second, the district court applied a presumption of reliance so that a class consisting of all parties who sold Basic stock during the merger negotiations could be certified as required by Rule 23 of the Federal Rules of Civil Procedure. With the presumption, reliance became a question common to all the class members rather than an individual question for each plaintiff. Therefore, the district court found that common questions of the class of stockholders predominated over individual questions as required by Rule 23. Having satisfied Rule 23, the class could be certified. The defendants claim that the class should not have been certified because use of this presumption was improper.
 
 
 4
 Until December 20, 1978, Basic primarily manufactured chemical refractories. Basic's stock was traded on the New York Stock Exchange. Combustion Engineering, the potential acquirer, engaged in a wide range of businesses, including the manufacture of alumina or acid-based refractories. Combustion's stock was also traded on the New York Stock Exchange. Combustion had been interested in acquiring Basic since 1965 or 1966. However, it was not until 1976, in the Kaiser-Lovino proceeding, that the Federal Trade Commission considered eliminating antitrust barriers to a merger of Basic and Combustion.[1] Included as a part of the "Strategic Plan" of Combustion's Industrial Products Group, dated October 25, 1976, was the statement "[a]cquire Basic, Inc. $30 million."
 
 
 5
 Beginning in September of 1976, James Kelly, Vice-President in charge of Combustion Engineering's Industrial Products Group, and other Combustion employees had a number of meetings and telephone conversations with Basic and its officers. One such contact occurred in September of 1976, when James Kelly telephoned Max Muller, the Chairman and Chief Executive Officer of Basic. The admitted purpose of the call was to arrange a meeting with Basic's management to discuss a possible merger. Between September, 1976, and October, 1977, Kelly made numerous telephone contacts as well as trips from Combustion's Connecticut offices to Basic's Cleveland offices. During these visits and in telephone conversations, Kelly talked with Muller, Matthew J. Ludwig, senior vice-president of Basic, and Anthony M. Caito, executive vice-president of Basic. They discussed Combustion's interest in acquiring Basic, "how we [Combustion] operated companies like Basic after acquisition," and that Combustion would consider Basic an independent unit after acquisition. During this period Combustion's lawyers were conducting an antitrust investigation for the acquisition and Muller provided Kelly with confidential, non-public information relating to Basic's sales and operations. In November, 1976, at a special meeting of the Executive Committee of Combustion's Board, Kelly was authorized to "continue to proceed" with "investigations, preparations and, as appropriate, negotiations with respect to the possible acquisition of Basic." Kelly told Basic of this authorization. Combustion's management told Combustion's investment bankers, First Boston, of the company's desire to acquire Basic and requested that they prepare analyses for the acquisition of prices of eighteen, twenty and twenty-two dollars per share.
 
 
 6
 At Basic, Muller circulated two memoranda to Basic's Board of Directors, both entitled "Recent Interest in Basic," in which Muller informed the Board of the meetings with Combustion's management and Combustion's antitrust study of the acquisition of Basic. At this stage no public statements had been made by either the Board of Basic or the Board of Combustion. In April, 1977, according to a time report of H. Chapman Rose, a Basic director and attorney, Rose met with other Basic lawyers to discuss a "possible bid by Combustion." An analysis was prepared which evaluated a merger with Combustion. Ludwig sent this analysis to Rose with a transmittal letter which stated, "Herewith the C-E 1976 Annual Report and the analysis we usually make in considering mergers or acquisitions which I promised." Other such analyses were prepared in March, 1978, and after September, 1978. In August, 1977, and on October 18, 1977, Basic's Management met with Basic's investment bankers, Kidder, Peabody, to discuss preparation of a valuation of Basic for use in the merger negotiations. Combustion again listed acquisition of Basic in its "Strategic Plan" of September 23, 1977. On October 12, 1977, Kelly met with Muller, Ludwig and Caito at Basic's offices. Kelly stated that they discussed the role Basic would have in Combustion's corporate structure. Throughout 1977 and 1978, there were repeated bouts of trading activity in Basic stock. On October 19 and 20, 1977, the trading volume of Basic soared from an average 6,000 to 8,000 shares per day to 29,000 shares per day. On October 21, 1977, the first public announcement from Basic by Muller, as reported in The Cleveland Plain Dealer, was issued and read in part:
 
 
 7
 President Max Muller said the company knew no reason for the stock's activity and that no negotiations were under way with any company for a merger. He said Flintkote recently denied Wall Street rumors that it would make a tender offer of $25 a share for control of the Cleveland-based maker of refractories for the steel industry.
 
 
 8
 Muller contends that this statement was issued to deny a rumor that Basic might merge with another company, Flintkote, and that the statement had nothing to do with the rather detailed discussions with Combustion.
 
 
 9
 Between October, 1977, and September, 1978, contacts continued between Basic and Combustion. Confidential information including very favorable financial forecasts and projections, analyses of the effects of the merger, and information about other companies interested in Basic was exchanged at numerous times. Kelly and Basic, especially through Muller, were often in contact. On June 7, 1978, Kelly met with Muller, Ludwig and Caito and gave them analyses prepared by Combustion. Muller's diary entry for the meeting stated, "Jim Kelly of CE offered $28.00." Muller said that the offer was "too low." Kelly then stated that Combustion would give a better figure but Muller told Kelly to "hold off til we tell you." Muller later stated that he wanted the Kidder, Peabody valuation of Basic to assist him in evaluating the offer. Muller, Ludwig and Caito then met with Rose and discussed the Combustion merger. They decided to ask Combustion for its "best offer." Rose advised the management to "stay out of the market."
 
 
 10
 On July 10, Muller noted in his diary that he and Kelly agreed in a telephone conversation that "Kelly will prepare an informal offer." Kelly advised against public disclosure at this time. Later in July, Kelly and Muller agreed that a "slow, deliberate approach" was proper. During this time, Combustion's investment bankers, First Boston, prepared analyses of acquisition prices at Combustion's direction and the Combustion Executive Committee renewed its support of the merger.
 
 
 11
 On July 14, the price of Basic's stock rose sharply.[2] David Dolan, the Exchange officer in charge of Basic stock, called Theodore Thomas, who had been designated as Basic's exchange liaison. Again Basic, through Thomas, denied that any undisclosed merger or acquisition plans or any other significant corporate developments existed. On September 14, 1978, at Combustion's request, First Boston prepared and delivered to Kelly a draft proposal letter for the acquisition of Basic.
 
 
 12
 On September 25, the price of Basic stock again rose.[3] Dolan, the Exchange official, called Ludwig at Basic and asked whether there were any undisclosed "merger or acquisition" plans, any developments relating to a possible "tender offer," any developments relating to prior announcements, any rumors, or any other significant corporate developments. For the third time, Basic flatly denied that there were any corporate developments. Ludwig consulted with Muller, who was in Europe, and issued the following untruthful release to the press which stated:
 
 
 13
 management is unaware of any present or pending corporate development that would result in the abnormally heavy trading activity and price fluctuation in company shares that have been experienced in the past few days.
 
 
 14
 Yet, the contacts between the two companies continued. The Kaiser-Lovino ruling that basic and non-basic refractories were separate markets was issued on October 12, so Kelly was advised that it "would be a good time to get the acquisition done." In the first week of November, Basic issued a "Nine Month Interim Report to Shareholders," in which for the fourth time it stated:
 
 
 15
 With regard to the stock market activity in the Company's shares we remain unaware of any present or pending developments which would account for the high volume of trading and price fluctuations in recent months.
 
 
 16
 On November 21, Muller telephoned John C. Wilson, Jr., an outside director of Basic, and discussed an offer from Combustion in the forty-five to fifty dollar range. On November 27, Kelly met with Muller, Caito and Ludwig and suggested an all cash price of thirty-five dollars per share. The price was refused. The next few weeks were a time of great activity as meetings were held and studies completed. On December 14, Combustion's Executive Committee approved acquisition of Basic at forty-six dollars per share. On Friday, December 15, Basic's stock price soared and for the fifth time Basic, with Thomas as the spokesman, answered the Exchange inquiry with a denial of corporate developments. Between January, 1978, and October or November, 1978, Ted Mayer, an analyst with Legg, Mason, Wood, Walker, Incorporated, was told by Muller at least six times that Basic had in fact been approached regarding potential merger activities.
 
 
 17
 On Monday, December 18, Basic asked the Exchange to suspend trading because they had been "approached" concerning a possible merger. On December 19, Basic accepted Combustion's tender offer. On December 20, 1978, after the plaintiffs had sold their Basic shares, Basic announced its approval of a Combustion tender offer to buy all of Basic's outstanding shares at a price substantially in excess of that at which the plaintiffs sold their shares.
 
 MATERIALITY
 
 18
 Section 10(b) of the Securities Exchange Act and Rule 10b-5 prohibit an issuer from making public statements that are untrue or, if literally true, are misleading because of material omissions. SEC v. Texas Gulf Sulfur Co., 401 F.2d 833, 860-62 (2d Cir.1968), cert. denied, 394 U.S. 976, 89 S.Ct. 1454, 32 L.Ed.2d 756 (1969). Rule 10b-5 states in part:
 
 
 19
 It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
 
 
 20
 * * *
 
 
 21
 * * *
 
 
 22
 (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.
 
 
 23
 17 C.F.R. Sec. 240.10b-5 (1984). These requirements insure that all investors have all relevant information for investment decisions and protect the basic integrity of the stock exchanges. Rochelle v. Marine Midland Grace Trust Co., 535 F.2d 523, 532 (9th Cir.1976).
 
 
 24
 Here the district court granted summary judgment for the defendants because it found the three statements at issue were not materially false or misleading in their denial of significant corporate developments. The court found that there were no negotiations occurring at the time of the first statement. It found the second and third statements were made while negotiations were occurring but that because these negotiations were not "destined, with reasonable certainty, to become a merger agreement in principle," they were not material. We find this reasoning flawed.
 
 
 25
 10b-5 cases begin with an analysis of whether a general duty to disclose exists. Then it must be determined whether the facts that the plaintiffs claim should have been disclosed were material. If the defendants were under a duty generally, and if the undisclosed facts were material, a violation has occurred if the other requisite 10b-5 factors such as scienter and reliance are also present. Here, we need not address whether Basic had a duty initially to disclose the contacts, discussions and information exchanges that were occurring with Combustion Engineering. An initial duty to disclose material merger negotiations exists only in certain limited circumstances. See Starkman v. Marathon Oil Co., 772 F.2d 231 (6th Cir.1985). Courts have held that a duty to disclose negotiations arises in situations, such as where the corporation is trading in its own stock, or where it is responsible for rumors of the discussions leaking into market. See, e.g., Staffin v. Greenberg, 672 F.2d 1196, 1202-07 (3d Cir.1982); State Teachers Retirement Bd. v. Fluor Corp., 654 F.2d 843, 850 (2d Cir.1981); Arber v. Essex Wire Corp., 490 F.2d 414, 418 (6th Cir.), cert. denied, 419 U.S. 830, 95 S.Ct. 53, 42 L.Ed.2d 56 (1974).
 
 
 26
 However, a far more important duty to disclose arises when the corporation has made a public statement which would be misleading without disclosure of the merger discussions. If a corporation is not under a duty to disclose corporate information, but voluntarily chooses to make a statement and the statement is "reasonably calculated to influence the investing public" the corporation then has a duty to disclose sufficient information so that the statement made is not "false or misleading or ... so incomplete as to mislead." Texas Gulf Sulfur, 401 F.2d at 862. See, e.g., Etshokin v. Texasgulf, Inc., 612 F.Supp. 1220, 1227-29 (N.D.Ill.1985); Schlanger v. Four-Phase Sys., Inc., 582 F.Supp. 128, 133-34 (S.D.N.Y.1984). See also In re Carnation Co., Sec.Exch. Act Rel. No. 22214 (July 8, 1985) [1984-85] Fed.Sec.L.Rep. (CCH) p 83,801.
 
 
 27
 Basic's duty to clarify and disclose the discussions arose only because of Basic's statements denying knowledge of "any present or pending corporate developments" when, as the record clearly illustrates, Basic was in contact with Combustion Engineering and merger discussions were occurring within the two corporations and between them. As officers and spokespersons for a publicly traded company, the employees of Basic had a responsibility and duty to be truthful. The discretion they possessed was in speaking at all; once they spoke they could not be patently untruthful. As we noted earlier, the record reveals numerous telephone calls between Basic and Combustion. Kelly, an officer of Combustion, visited Basic's headquarters frequently. The record illustrates that a merger of the two corporations was the purpose of these contacts and that the conversations focused on that topic.
 
 
 28
 These facts made Basic's denials of any knowledge of corporate developments that would cause high trading volume in Basic stock misleading, if not totally false. Basic's statements were read narrowly by the district court to say that Basic did not know the reason for the unusual market activity. Yet, even if that proposition were true, in that Basic, for some reason, never knew the reason for the unusual market activity, the statements were misleading in that they could reasonably be read broadly by the public as flat disclaimers of any significant corporate developments that might account for the high volume stock activity.
 
 
 29
 Basic's statement that "no negotiations" were occurring was also misleading, if not patently untrue. Basic argues that the denial was technically correct because no discussions occurred which would satisfy the legal definition of "negotiations." The average investor does not necessarily know the technical and legal definition of these words as used by Basic. A statement that "no negotiations" were occurring could reasonably be read to state that no contacts of any kind whatsoever regarding merger had occurred. Because of the "Strategic Plan" of Combustion regarding Basic, had there been only one telephone call from Kelly to Muller, this statement would have been clearly untrue. Thus, the various denials by Basic were affirmative misrepresentations. Basic's silence following these misrepresentations is not the same as Basic's silence had Basic not made any statement. In these early stages of the discussions between Combustion and Basic, Basic had no duty to speak, but once it spoke, it assumed the legal duty to be truthful. See, e.g., Treadway Companies, Inc. v. Care Corp., 638 F.2d 357, 379 (2d Cir.1980).
 
 
 30
 Under Rule 10b-5, "[a] duty to speak the full truth arises when a defendant undertakes to say anything." First Virginia Bankshares v. Benson, 559 F.2d 1307, 1317 (5th Cir.1977), cert. denied, 435 U.S. 952 (1978). For example, in Schlanger v. Four-Phase Sys., Inc., 582 F.Supp. 128 (S.D.N.Y.1984), a class of plaintiff shareholders brought an action against certain officers and directors of Four-Phase Systems. The plaintiffs claimed that the defendants had issued a public statement indicating that the company was "not aware of any corporate developments which would affect the market of its stock," id. at 129, when, in fact, merger negotiations were underway. The court stated:
 
 
 31
 While the federal securities laws do not impose a general duty upon an issuer to disclose material facts or new developments when it is not trading in its own securities, it does have a duty to make certain that any statement it does issue is truthful and complete, and does not materially misrepresent the facts existing at the time of the announcement. Securities and Exchange Commission v. Texas Gulf Sulphur Co., 401 F.2d 833, 860-62 (2d Cir.1968) (en banc), cert. denied, 394 U.S. 976 (1969); see also State Teachers Retirement Board v. Fluor Corp., 654 F.2d 843, 853 (2d Cir.1981). In this case, defendants did make an announcement, intended to be relied on by purchasers and sellers, and therefore had a duty to make a statement which was both truthful insofar as it went, and not misleading in light of the facts known at that time.
 
 
 32
 Schlanger, 582 F.Supp. at 133. See also Teamsters Local 282 Pension Trust Fund v. Angelos, 762 F.2d 522, 529-31 (7th Cir.1985).
 
 
 33
 Having established a duty to disclose certain omitted facts, we must now determine whether those facts were material. As defined in TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976), an omitted fact is material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." See also SEC v. Washington County Util. Dist., 676 F.2d 218, 225 (6th Cir.1982). When a company whose stock is publicly traded makes a statement, as Basic did, that "no negotiations" are underway, and that the corporation knows of "no reason for the stock's activity," and that "management is unaware of any present or pending corporate development that would result in the abnormally heavy trading activity," information concerning ongoing acquisition discussions becomes material by virtue of the statement denying their existence. The "reasonable investor," having been informed that Basic knew of no corporate development that would result in the high trading activity, would, without doubt, have thought that disclosure of the fact that acquisition was being discussed "significantly altered the 'total mix' of information made available."
 
 
 34
 In Holmes v. Bateson, 583 F.2d 542 (1st Cir.1978), a nondisclosure case, the plaintiff, an estate, sold its shares of Maguire Corporation to Maguire on January 6, 1970. Id. at 550. Maguire, as of that date, had had one expression of interest and had had preliminary discussions with two other companies. Id. at 546-50. The First Circuit found it "inconceivable that a reasonable stockholder would not think that the merger information concealed in this case was important and, therefore, material." Id. at 558. We, too, find it "inconceivable" that Basic stockholders would not find the fact that discussions were occurring between Combustion and Basic, in light of Basic's statements, to be important and, therefore, material to making normal reasonable investment decisions.
 
 
 35
 In contrast, a divided panel of the Third Circuit in Greenfield v. Heublein, Inc., 742 F.2d 751 (2d Cir.1984), cert. denied, --- U.S. ----, 105 S.Ct. 1189, 84 L.Ed.2d 335 (1985), expressed a view with which we are in disagreement, holding in a similar fact situation that such a statement was not false or misleading. In Greenfield, Heublein was in the midst of merger negotiations but issued a statement that the company was unaware of any reason that explained the unusual activity in its stock. Id. at 754. The court stated that the management "clearly knew of information that might have accounted for the increase in trading." Id. at 759. However, the panel felt bound by earlier Third Circuit precedent and following Staffin v. Greenberg, 672 F.2d 1196 (3d Cir.1982), found the statement not false or misleading because the merger discussions were only preliminary. Greenfield, 742 F.2d at 755-59. The Greenfield court stated that the company's voluntary statement that it knew of no reason for heightened activity of the stock was not misleading because the merger discussions were not material and, therefore, their omission could not have been an "[omission] of a material fact" as prohibited by Rule 10b-5. Id. at 756-59.
 
 
 36
 We feel the Greenfield court's reliance on Staffin was clearly misplaced. In Staffin, Bluebird, Incorporated made a tender offer for its own shares on June 11, 1979. An officer of Bluebird, on July 11, discussed the possibility of acquisition with another company, Northern Foods, Ltd. Staffin, 672 F.2d at 1200-01. No statement was made by Bluebird that in any way touched upon the meeting of July 11. The plaintiffs in Staffin argued that these actions were an unlawful failure to disclose a material fact. Id. at 1205. Though the court did note that Bluebird was under a general duty to disclose because a tender offer was in progress, the court stated that preliminary merger discussions were immaterial as a matter of law. Therefore, nondisclosure of these immaterial facts could not be misleading. Id. at 1205-06.
 
 
 37
 The Staffin court's determination that preliminary merger discussions were not material as a matter of law was made in the context of whether any information needed to be initially and affirmatively disclosed. This determination of materiality is certainly not necessary in a posture similar to the one in Greenfield where a voluntary statement was made which was factually untrue. In analyzing whether information regarding merger discussions is material such that it must be affirmatively disclosed to avoid a violation of Rule 10b-5, the discussions and their progress are the primary considerations. However, once a statement is made denying the existence of any discussions, even discussions that might not have been material in absence of the denial are material because they make the statement made untrue.[4] The Greenfield decision failed to note this difference of contexts.
 
 
 38
 Having disposed of the materiality issue, we turn now to the question whether the plaintiffs have offered sufficient proof that the other necessary elements to establish the 10b-5 violation are present. Because our ruling on materiality is contrary to that of the district court, we must vacate the summary judgment and remand the case to the district court for further consideration on these issues. We note that the district court, in dealing with the scienter issue, stated:
 
 
 39
 [T]his court has concluded that non-disclosure did not violate Rule 10b-5, because the information has not been found to be material. Hence, the act of non-disclosure cannot constitute proof of scienter, i.e., that the defendants were engaging in either intentionally misleading the investment public or that nondisclosure was "highly unreasonable conduct" with reference to the investment public.
 
 
 40
 Scienter, a traditional element of a section 10(b) and Rule 10b-5 action, Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193, 96 S.Ct. 1375, 1380-81, 47 L.Ed.2d 668 (1976), can be proven by a showing that the defendants issued false or misleading public statements with knowledge that those statements were false or misleading, or with reckless disregard as to their false or misleading character. See, e.g., Herm v. Stafford, 663 F.2d 669, 684 (6th Cir.1981); Mansbach v. Prescott, Ball, & Turben, 598 F.2d 1017, 1023-25 (6th Cir.1974).
 
 
 41
 Because summary judgment is generally inappropriate for issues of scienter, knowledge and intent, see, e.g., Poller v. Columbia Broadcasting Sys., Inc., 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962); Smith v. Hudson, 600 F.2d 60, 66 (6th Cir.), cert. dismissed, 444 U.S. 986, 100 S.Ct. 495, 62 L.Ed.2d 415 (1979), this issue must be first decided by the district court and may not be decided by us as a matter of law.
 
 CLASS CERTIFICATION
 
 42
 The second major issue for us to resolve is the class determination made by the district court. Basic and the individual defendants claim that the district court erred in certifying the class of plaintiffs. The district court, in analyzing whether Rule 23 of the Federal Rules of Civil Procedure had been satisfied, found the requirement of Rule 23(b)(3) problematic. That rule provides, in part, that a class will be certified only if "the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members." Here the district court believed that if each of the members of this class, sellers of Basic shares between October 20, 1977, and December 15, 1978,[5] were required to show reliance on the misrepresentations, questions affecting individual members probably would predominate over common questions such that the class certification would be improper. To circumvent what the district court perceived to be a barrier to class actions in 10b-5 cases, it applied a presumption of reliance so that common questions predominated and the class was appropriately certified. We agree.
 
 
 43
 Reliance is the element of a Rule 10b-5 action that establishes the causal nexus between the defendant's wrongful conduct and the plaintiff's injuries. Blackie v. Barrack, 524 F.2d 891, 906 (9th Cir.1975), cert. denied, 429 U.S. 816, 97 S.Ct. 57, 50 L.Ed.2d 75 (1976). The clearest statement of the theory of presumption of reliance is found in Note, The Fraud-on-the-Market Theory, 95 Harv.L.Rev. 1143 (1982). In two distinct situations, where proof of actual reliance would be impractical or impossible, courts have applied the doctrine of presumption of reliance. Note, The Reliance Requirement in Private Actions under SEC Rule 10b-5, 88 Harv.L.Rev. 584, 589 (1975), quoted in Vervaecke v. Chiles, Heider & Co., 578 F.2d 713, 717 (8th Cir.1978). One situation involves non-disclosure of material facts in face-to-face transactions. See Affiliated Ute Citizens v. United States, 406 U.S. 128, 153-54, 92 S.Ct. 1456, 1472, 13 L.Ed.2d 741 (1972). The other involves material public misrepresentations that distort the price of stock on the impersonal market, in other words, a fraud on the market. See Note, 95 Harv.L.Rev. at 1148-49.
 
 
 44
 The fraud on the market theory is based on two assumptions: first, that in an efficient market the price of a stock will reflect all information available to the public, id. at 1154 & n. 44; and, second, that an individual relies on the integrity of the market price when dealing in that stock. Blackie, 524 F.2d at 907. When a defendant is shown to have made a material public misrepresentation that, if relied on directly, would fraudulently induce an individual to misjudge the value of the stock, the theory presumes that some investors did so rely and that the market price is distorted. When a plaintiff purchases on the impersonal market after these misrepresentations are made, the theory presumes that he relied on the supposed integrity of the market price, and thus indirectly on the misrepresentation. These two presumptions apply whether the misrepresentations would induce an overvaluing by a relying investor and thus an artificial inflation of the market price, or an undervaluing and a resultant artificial deflation.
 
 
 45
 In order to invoke the presumption of reliance based upon the fraud on the market theory, a plaintiff must allege and prove five elements. A plaintiff must demonstrate (1) that the defendants made public misrepresentations, Blackie, 524 F.2d at 906, (2) that the misrepresentations were material, id. (3) that the stock was traded on an efficient market, Note, 95 Harv.L.Rev. at 1161, (4) that the misrepresentations would induce a reasonable, relying investor to misjudge the value of the stock, see Schlanger v. Four-Phase Systems, Inc., 555 F.Supp. 535, 538 (S.D.N.Y.1982), and (5) that the plaintiff traded in the stock between the time the misrepresentations were made and the time the truth was revealed.[6] Blackie, 524 F.2d at 906. We believe the record supports the allegations that relate to elements (1) and (2). The Basic stock was traded on an efficient market and the plaintiffs have sufficiently pled a sale of the stock during the relevant period (elements (3) & (5)). The only real question then is element (4)--whether the plaintiffs can prove that a reasonable investor who was aware of the defendant's statements would have undervalued the stock. The plaintiffs claim that the misrepresentations were intended to and did deflate the price of Basic's stock. This allegation satisfies element (4) for pleading purposes and should not be dismissed as a matter of law. See Schlanger, 555 F.Supp. at 538-39. If the plaintiffs are able to prove this and the other elements, it will be quite logical to presume that some investors relied on the misrepresentations resulting in a deflation of stock price and that members of the class relied upon the supposed integrity of the market price when selling their shares. The mere fact that the proof could be difficult does not preclude the opportunity to make the presentation at trial.
 
 
 46
 The fraud on the market theory has been consistently applied in cases in which the defendants made public, material misrepresentations and the plaintiffs transacted shares in an impersonal, efficient market. See Lipton v. Documation, Inc., 734 F.2d 740 (11th Cir.1984), cert. denied, --- U.S. ----, 105 S.Ct. 814, 83 L.Ed.2d 807 (1985); T.J. Raney & Sons, Inc. v. Fort Cobb, Oklahoma Irrigation Fuel Auth., 717 F.2d 1330 (10th Cir.1983), cert. denied, 465 U.S. 1026, 104 S.Ct. 1285, 79 L.Ed.2d 687 (1984); Shores v. Sklar, 647 F.2d 462 (5th Cir.1981), cert. denied, 459 U.S. 1102, 103 S.Ct. 722, 74 L.Ed.2d 949 (1983); Ross v. A.H. Robins Co., 607 F.2d 545 (2d Cir.1979), cert. denied, 446 U.S. 946, 100 S.Ct. 2175, 64 L.Ed.2d 802 (1980); Blackie v. Barrack, 524 F.2d 891 (9th Cir.1975), cert. denied, 429 U.S. 816, 97 S.Ct. 57, 50 L.Ed.2d 75 (1976). Here, the defendants made public, material misrepresentations and the plaintiffs sold Basic stock in an impersonal, efficient market. Thus the class, as defined by the district court, has established the threshold facts for proving their loss.
 
 
 47
 Cases in which application of the presumption of reliance has not been applied are easily distinguished because they do not involve a public misrepresentation or an impersonal exchange in the open market. For example, this Circuit, in Fridrich v. Bradford, 542 F.2d 307 (6th Cir.1976), cert. denied, 429 U.S. 1053, 97 S.Ct. 767, 50 L.Ed.2d 769 (1977), refused to apply the presumption of reliance. In Fridrich former shareholders of Old Line Life Insurance brought an action to recover against five insiders who had traded Old Line stock while in possession of material information about merger negotiations. None of the trades were directly with the plaintiffs. The duty to disclose arose from the insider trading. No public statements were made when the defendants traded in the stock, and, because the insider trading was secret, there was no way in which their wrongful acts could have affected market price. See also Laventhall v. General Dynamics, 704 F.2d 407 (8th Cir.), cert. denied, 464 U.S. 846, 104 S.Ct. 150, 78 L.Ed.2d 140 (1983) (insider trading, no public statement); Vervaecke v. Chiles, Heider & Co., 578 F.2d 713 (8th Cir.1978) (misrepresentations surrounding the initial offering of corporate bonds, a situation in which price is not a reflection of the transactions of investors).
 
 
 48
 The situation before us is clearly not analogous to these cases. Therefore the district court was correct in applying the presumption of reliance to this case to allow that the class be certified.
 
 
 49
 We reverse the summary judgment granted to the defendants on the section 10(b) and Rule 10b-5 issue; we affirm the Rule 23 class certification and remand the case to the district court for further proceedings.
 
 
 
 [1]
 In the Kaiser-Lovino proceeding, the FTC took the position that basic or chemical refractories were in a separate market than acidic or alumina refractories
 
 
 [2]
 By 2:52 p.m. the price of Basic stock was up 3 1/8 points (or more than 12%) to 26 7/8 on a trading volume of approximately 18,200 shares
 
 
 [3]
 By 11:25 a.m., Basic stock was up 2 1/2 points to 32 7/8 on a volume of approximately 28,500 shares, even though the Dow Jones Index was down more than 3 points. The prior trading day, Basic had risen another 2 1/8 points on volume of 31,900 shares. Normal trading volume in Basic stock was 2,000 to 8,000 shares
 
 
 [4]
 In Etshokin v. Texasgulf, Inc., 612 F.Supp. 1220 (N.D.Ill.1985), plaintiffs claimed that officers of Texasgulf had been involved in merger negotiations at the time Texasgulf issued a statement denying any knowledge of a reason its stock was being traded actively. Id. at 1222. In ruling that summary judgment was improper, the court noted that the denials themselves as well as the trading activity were factors which should be considered in determining materiality. Id. at 1229
 
 
 [5]
 The district court excluded persons who had purchased shares after the October, 1977, statement and sold before the September, 1978, statement and also excluded persons who had sold shares after the close of the market on December 15, 1978
 
 
 [6]
 A defendant can defend against this presumption of reliance in two ways. First, of course, a defendant can rebut proof of the five elements that give rise to the presumption. Second, a defendant can disprove the presumed facts by showing that "an insufficient number of traders relied to [distort] the price" or that "an individual plaintiff [traded] despite knowledge of the falsity of a representation, or that he would have, had he known it." Blackie, 524 F.2d at 906