Hannah **FINKEL**, Plaintiff-Appellant,

v.

**DOCUTEL/OLIVETTI CORPORATION, et al, Defendants-Appellees.**

No. 86–1680.

United States Court of Appeals, Fifth Circuit.

May 27, 1987.

Jules Brody, Stull, Stull & Brody, New York City, W.D. Masterson, Kilgore & Kilgore, Inc., Dallas, Tex., for plaintiff-appellant.

* District Judge for the Eastern District of Louisiana, sitting by designation.

Steven M. Woghin, Robert F. Henderson, Dallas, Tex., for Docutel/Olivetti, DeMoss, & Meredith.

George M. Newcombe, David E. Massengill, New York City, for Ing. Olivetti & C., DeBenedetti, Fubini & Piol.

Before JOLLY and DAVIS, Circuit Judges and FELDMAN,* District Judge.

FELDMAN, District Judge:

This appeal asks whether the fraud on the market theory applies in 10b–5 securities fraud suits when the securities at issue were purchased in the open market. In the limited context of this opinion, we hold that the answer is yes and, therefore, proof of reliance on specific misconduct in the purchase or sale of a security in the open market is not a requisite key to recovery. Thus, we affirm in part and reverse in part, and remand to the district court for proceedings consistent with the parameters set here.

## I. BACKGROUND

Plaintiff, Hannah Finkel, brought this action on behalf of herself and other purchasers of the stock of Docutel/Olivetti Corporation alleging violations of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 of the Securities and Exchange Commission. In the complaint, plaintiff pleaded the fraud on the market theory to satisfy the reliance element of her claim. She alleged that Docutel's inventories were materially overstated, that defendants failed to disclose the true value of Docutel's inventories (which artificially inflated the market price of Docutel), and that she suffered damages because she relied on the integrity of the market price when she purchased Docutel's stock. The stock was purchased in the open market.

Docutel is a Delaware corporation that was formed to produce automatic teller machines. In 1982, Docutel, by merging with Olivetti Corporation of America,[1] expanded

1. After the merger, a subsidiary of Olivetti owned 46% of Docutel's stock. In August 1985,

its product line to include typewriters, personal computers, and related equipment. Olivetti Corporation is the United States subsidiary of defendant Ing. C. Olivetti & C., S.p.A., an Italian corporation. Defendants B.J. Meredith and Emmet R. DeMoss were officers of Docutel during the period at issue. Defendants Carlo DeBenedetti and Simone Fubini were officers of Olivetti and directors of Docutel. And defendant Elserino M. Piol was a director of both corporations.

Docutel's stock trades in the over-the-counter market (a reporting network in which transactions in securities are reported to the National Association of Securities Dealers for publication). It is a publicly owned and traded corporation. As of October 1, 1983, Docutel had issued and outstanding 6.8 million shares of common stock held by approximately 3,200 public shareholders. On December 5, 1983, plaintiff purchased 300 shares of Docutel at $14–⅝ per share for a total price of $4,474.75. On February 16, 1984, just months later, Docutel announced a projected net loss of $14,000,000 for 1983. This projection proved to be low, and Docutel's form 10–K for 1983 reported a loss of $18,263,000, including $10,900,000 of inventory write-downs. On April 6, 1984, Docutel's stock price closed at $7–¼, significantly below its 1983 high of $38–⅞.

Plaintiff claims that Olivetti, by virtue of its 46% interest in Docutel, controlled Docutel and used that control to hide its losses in Olivetti of America. Her central complaint is that throughout 1983 Docutel purchased Olivetti Corporation of America's inventories at inflated prices,[2] but that Docutel concealed this fact until early 1984 when the year-end audit forced it to take large inventory write-downs. The inventory write-downs totalled $10,900,000 of which approximately $10,100,000 was recorded in the fourth quarter.[3] The essential thrust of her charge is that the delay in taking the write-downs defrauded purchasers of Docutel stock who bought it between the release of Docutel's form 10–Q for the first quarter of 1983 and the subsequent statements projecting losses for 1983, by causing them to buy at an inflated price.[4]

Defendants moved to dismiss the complaint under Fed.R.Civ.P. 12(b)(6) because plaintiff failed to plead reliance on any specific misleading statement, and under Fed.R.Civ.P. 9(b) for failure to plead fraud with particularity. Discovery and class certification were deferred pending a ruling on the motion to dismiss.[5] On August 20, 1983, the district court dismissed the complaint on the ground of failure to plead individual reliance. The court held that, under *Shores v. Sklar,* 647 F.2d 462 (5th Cir.1981) (en banc), *cert. denied,* 459 U.S. 1102, 103 S.Ct. 722, 74 L.Ed.2d 949 (1983), the fraud on the market theory applies only to the special example of unmarketable securities. Since the plaintiff claimed only that "the price was too high when she bought it", rather than that Docutel's stock was unmarketable at any price, the court held that her failure to plead individual reliance was fatal and the case was dismissed. We hold the court read *Shores v. Sklar* too narrowly.

## II. DEVELOPMENT OF THE FRAUD ON THE MARKET THEORY

Reliance is one of the cornerstones of a Rule 10b–5 claim. *Dupuy v. Dupuy,*

Docutel was merged into a wholly owned subsidiary of Docutel, and re-named Olivetti, U.S.A., Inc.

**2.** Docutel paid $10,163,000 in the first quarter, $34,940,000 in the second quarter, and $57,002,000 in the third quarter.

**3.** In its 1983 form 10–K, Docutel stated: "In 1983, the Company's record keeping procedures and accounting staff were strained due to the significant growth in transaction volume resulting from the merger with Olivetti Corporation, attrition of personnel, and the transfer in the second half of 1983 of the OPD accounting function from Tarrytown, New York, to the Company's headquarters in Irving, Texas."

**4.** Plaintiff seeks to bring this action on behalf of all purchasers of the common stock of Docutel who bought it between April 29, 1983 and February 16, 1984.

**5.** Because no discovery was taken, the record is spare; it consists of only basic pleadings.

551 F.2d 1005, 1014 (5th Cir.), *cert. denied,* 434 U.S. 911, 98 S.Ct. 312, 54 L.Ed.2d 197 (1977). The Rule 10b–5 cause of action is rooted in the ancient common law tort of deceit, which required proof of reliance on the defendant's specific misrepresentation. *Huddleston v. Herman & MacLean,* 640 F.2d 534, 547 (5th Cir.1981), *affirmed in part and reversed in part,* 459 U.S. 375, 102 S.Ct. 683, 74 L.Ed.2d 548 (1983). Proof of reliance establishes that the damaged party was induced to act by the defendant's conduct; it defines the causal link between defendant's misconduct and the plaintiff's decision to buy or sell securities. *Id.; Dupuy, supra,* at 1016. It is the generally applied bond between bad conduct and damages. It confirms the rather universal notion that one damaged ought not be rewarded for one's own deficient conduct.

The issue presented here, however, is not whether reliance is an element of Rule 10b–5, but how it may be proved, and who must prove it.

Two doctrines have evolved which assert how a plaintiff may satisfy the reliance element without specially proving that he or she relied directly on some active misrepresentation: the *Affiliated Ute* presumption, and the "fraud on the market" theory. They interact.

### A. The *Affiliated Ute* Presumption

In *Affiliated Ute Citizens v. United States,* 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972), the Supreme Court held that the 10b–5 plaintiff does not have to present positive proof of reliance in all securities fraud settings. Two of the defendants in *Affiliated Ute* bought stock from the plaintiffs without disclosing to them the existence of a secondary market in which the securities could be sold at a higher price. The defendants were not only aware of the secondary market, but had developed it themselves. The Court explained why positive proof of reliance was not required:

"It is no answer to urge that, as to some of the petitioners, these defendants may have made no positive representation or recommendation. . . .

Under the circumstances of this case, involving primarily a failure to disclose, positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision."

*Id.,* 406 U.S. at 153–54, 92 S.Ct. at 1472 (citations omitted).

Courts applying *Affiliated Ute* have doctrinally invoked a rebuttable presumption of reliance based on proof of materiality in cases alleging deception by non-disclosure of information.[6] In *Rifkin v. Crow,* 574 F.2d 256 (5th Cir.1978), this Court summarized the pattern that emerged after *Affiliated Ute:*

"Where a 10b–5 action alleges defendant made positive misrepresentations of material information, proof of reliance by the plaintiff upon the misrepresentation is required. Upon an absence of proof on the issue, plaintiff loses. On the other hand, where a plaintiff alleges deception by defendant's nondisclosure of material information, the *Ute* presumption obviates the need for plaintiff to prove actual reliance on the omitted information. Upon a failure of proof on the issue, defendant loses. But this presumption of reliance is not conclusive. If defendant can prove that plaintiff did not rely, that is, that plaintiff's decision would not have been affected even if defendant had disclosed the omitted facts, the plaintiff's recovery is barred."

574 F.2d at 262 (footnotes omitted).

A court must, therefore, analytically characterize a 10b–5 action as either primarily a nondisclosure case (which would make the presumption applicable), or a positive misrepresentation case. Actually, the

---

**6.** The Supreme Court did not decide whether the presumption should be conclusive or rebuttable. In fact, the word "presumption" does not even appear in the *Affiliated Ute* opinion. *See Chris-Craft Industries v. Piper Aircraft Corp.,* 480 F.2d 341, 400 (2d Cir.) Mansfield, Jr., concurring and dissenting, *cert. denied,* 414 U.S. 910, 94 S.Ct. 231, 38 L.Ed.2d 148, and at 414 U.S. 924, 94 S.Ct. 234, 38 L.Ed.2d 158 (1973).

division of 10b–5 actions into these two categories is justified by the Rule itself.[7] Cases involving primarily a failure to disclose implicate the first and third subsections of Rule 10b–5; cases involving primarily a misstatement or failure to state a fact necessary to make statements made not misleading implicate the second subsection (which is the only subsection of the Rule that specifically mentions the active misrepresentation concept of prohibited conduct). *Huddleston v. Herman & MacLean,* 640 F.2d at 548.

B. The Fraud on the Market Theory

We turn briefly from judicial literature to economic doctrine.

The fraud on the market theory is premised on the hypothesis that the market price of a security, in an open market environment as opposed to a private transaction between seller and buyer, accurately reflects the value of that security if all relevant information has been disclosed in the marketplace.[8] When one fails to disclose or misrepresents material information about a security, the market's efficient pricing mechanism is skewed and the price of the security is distorted. A purchaser or seller who relies on the market to accurately value the security suffers damages if the market does not have all the information. Thus, the fraud on the market theory rejects the traditional notion of the investor who acts after carefully examining all available information.[9] It says investors need not, and do not, act that way in an open market transaction because they have a right to presume the market's integrity. It constructs an environment which is hospitable to the reliance presumption of *Affiliated Ute.* In place of the traditional model it substitutes a market model in which the explicit assumption is that the market relied on the alleged deception, and it rejects the conceptual need to inquire whether or not the injured party did. The market becomes the theoretical agent of the investor.[10]

7. Rule 10b–5 provides:
"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
(a) To employ any device, scheme, or artifice to defraud,
(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
in connection with the purchase or sale of any security.
17 C.F.R. § 240 10b–5 (1986). Although the sections are lettered, we refer to them numerically because the *Affiliated Ute* opinion does.

8. This is called the "efficient market" model. "An efficient capital market is one in which the price of the stock at a given time is the best estimate of what the price will be in the future." Fischel, *Use of Modern Finance Theory in Securities Fraud Cases Involving Actively Traded Securities,* 38 Bus.Law. 1, 4 n. 9 (1982). The doctrine states that the price of securities is a function of the information the market possesses, both positive and negative, assuming all information is disclosed. *In re LTV Securities Litigation,* 88 F.R.D. 134, 144 (N.D.Tex.1980). Al-

though not all scholars agree about its validity, disciples of the theory find proof of its validity in the theory of random selection. *See id.* at 145 (various institutional investors rely on the efficient market hypothesis by purchasing a random cross-section of stocks). The efficient market model is thought to operate in open or "developed" market transactions, which simply refers to some large, impersonal actively traded market. *See* Note, *The Fraud-on-the-Market Theory,* 95 Harv.L.Rev. 1143, 1154 (1982).

9. *See* Fischel, 38 Bus.Law. 1, 2–5; Note, *The Fraud-on-the-Market Theory,* 95 Harv.L.Rev. 1143, 1159 (1982) ("[R]ecent scholarship suggests that the dissenters' vision of individual investors reading and relying upon information required to be disclosed in registration statements and the like is suspect. Most SEC disclosure documents not only go unread by their intended recipients but in fact 'can be used effectively only by market professionals.'") (quoting H. Kripke, The SEC and Corporate Disclosure at 14 (1979)).

10. One way of perceiving the market's role is as "a transmission belt linking the misrepresentation and the individual purchaser or seller." *In re LTV Securities Litigation,* 88 F.R.D. 134, 143 (N.D.Tex.1980). The theory has special and obvious appeal in class actions because the need to prove a personalized reliance by each class member is avoided.

## III. HOW COURTS HAVE USED THE THEORY

The premiere fraud on the market case is *Blackie v. Barrack*, 524 F.2d 891 (9th Cir. 1975), *cert. denied*, 429 U.S. 816, 97 S.Ct. 57, 50 L.Ed.2d 75 (1976), in which the court held that the plaintiffs did not have to prove direct reliance on false representations. Instead, they could prove reliance on "the supposition that the market price is validly set and that no suspected manipulation has artificially inflated the price." *Id.* at 907. The court in *Blackie* relied heavily on *Affiliated Ute*, extrapolating the principle that direct proof of reliance is unnecessary when it imposes an unreasonable evidentiary burden. *Id.* at 908. The court gave content to what became the post-*Affiliated Ute* pattern by establishing a presumption of reliance. *Id.* at 906.

The fraud on the market theory has been adopted, in some form, by every Circuit considering it.[11] It has been favorably received by many scholars.[12] The Securities and Exchange Commission accepts the effi-cient market hypothesis, which underlies the fraud on the market theory.[13] Even those who question the efficient market hypothesis concede that the hypothesis, and the fraud on the market theory that is based on it, are widely accepted.[14]

## IV. THE DECISION IN *SHORES v. SKLAR*

This Circuit, *en banc*, addressed the fraud on the market theory in *Shores v. Sklar*, 647 F.2d 462 (1981),[15] and the parties agree that it controls the issue before the Court. They disagree, however, on what *Shores* means. Appellant interprets *Shores* as broadly embracing the fraud on the market theory. Appellant argues that *Shores* extended the applicability of the fraud on the market theory beyond securities trading in active, open markets to include newly issued securities as well. Appellees counter that *Shores* recognized only a closely circumscribed fraud on the market cause of action—a cause of action limited to securities that, except for the alleged

11. *Schlick v. Penn-Dixie Cement Corp.*, 507 F.2d 374 (2d Cir.1974), *cert. denied*, 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975); *Panzirer v. Wolf*, 663 F.2d 365 (2d Cir.1981), *vacated as moot sub nom. Price Waterhouse v. Panzirer*, 459 U.S. 1027, 103 S.Ct. 434, 74 L.Ed.2d 594 (1982); *Peil v. Speiser*, 806 F.2d 1154 (3d Cir.1986); *Shores v. Sklar*, 647 F.2d 462 (5th Cir.1981) (*en banc*), *cert. denied*, 459 U.S. 1102, 103 S.Ct. 722, 74 L.Ed.2d 949 (1983); *Levinson v. Basic, Inc.*, 786 F.2d 741 (6th Cir.1986); *Teamsters Local 282 Pension Trust Fund v. Angelos*, 762 F.2d 522 (7th Cir.1985); *Harris v. Union Electric Co.*, 787 F.2d 355 (8th Cir.), *cert. denied*, — U.S. —, 107 S.Ct. 94, 93 L.Ed.2d 45 (1986); *Blackie v. Barrack*, 524 F.2d 891 (9th Cir.1975), *cert. denied*, 429 U.S. 816, 97 S.Ct. 57, 50 L.Ed.2d 75 (1976); *Arthur Young & Co. v. United States District Court*, 549 F.2d 686 (9th Cir.) *cert. denied*, 434 U.S. 829, 98 S.Ct. 109, 54 L.Ed.2d 88 (1977); *Zweig v. Hearst Corp.*, 594 F.2d 1261 (9th Cir.1979); *T.J. Raney & Sons, Inc. v. Fort Cobb Oklahoma Irrigation Fuel Authority*, 717 F.2d 1330 (10th Cir.1983), *cert. denied*, 465 U.S. 1026, 104 S.Ct. 1285, 79 L.Ed.2d 687 (1984); *Lipton v. Documation, Inc.*, 734 F.2d 740 (11th Cir.1984), *cert. denied*, 469 U.S. 1132, 105 S.Ct. 814, 83 L.Ed.2d 807 (1985); *Wachovia Bank & Trust v. National Student Marketing Corporation*, 650 F.2d 342, 358 (D.C.Cir.1980), *cert. denied*, 452 U.S. 954, 101 S.Ct. 3098, 69 L.Ed.2d 965 (1981).

12. *See* Black, *Fraud on the Market: A Criticism of Dispensing with Reliance Requirements in Certain Open Market Transactions*, 62 N.C.L. Rev. 435 (1984); Rapp, *Rule 10b–5 and "Fraud-on-the-Market"—Heavy Seas Meet Tranquil Shores*, 39 Wash. & Lee L.Rev. 861 (1982); Note, *Fraud on the Market: An Emerging Theory of Recovery Under SEC Rule 10b–5*, 50 Geo.Wash. L.Rev. 627 (1982); Note, *The Fraud-on-the-Market Theory*, 95 Harv.L.Rev. 1143 (1982).

13. SEC Securities Act Release No. 6383, 47 Fed. Reg. 11,380 (1982); SEC Securities Act Release No. 6235, Proposed Comprehensive Revision to the System for Registration of Securities Offerings, [1980 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 82,649, at 83,484; Executive Summary of Securities Act Releases 6331–38, Proposed Rulemaking to Implement the Integrated Disclosure System, [1981–1982 Transfer Binder] Fed. Sec.L.Rep. (CCH) ¶ 83,016, at 84,479. *See also* Pickholz and Horahan, *The SEC's Version of the Efficient Market Theory and Its Impact on Securities Law Liabilities*, 39 Wash. and Lee L.Rev. 943 (1982).

14. *See, e.g.*, Gordon and Kornhauser, *Efficient Markets, Costly Information and Securities Research*, 60 N.Y.U.L.Rev. 760, 761–62 (1985).

15. In *Rifkin v. Crow*, 574 F.2d 256, 263–64 (5th Cir.1978), the court discussed the fraud on the market theory without deciding whether to endorse it.

fraud, would not have been offered in the market at any price. With these divergent views in mind, we turn to *Shores v. Sklar.*

The plaintiff in *Shores,* Bishop, alleged the existence of an elaborate scheme to defraud investors through the issuance of worthless bonds. The district court, on the defendants' motion to dismiss, treated the motion as one for summary judgment and entered judgment on the ground that there was no genuine issue of material fact as to plaintiff's reliance on the Offering Circular for the bonds; Bishop had admitted in answers to interrogatories that he had not read nor was he aware of the allegedly misleading Offering Circular through which the bonds were marketed.

All twenty-two members of the *en banc* Court agreed that the district court's ruling should be affirmed as to Bishop's claim under Rule 10b–5(2), the second subsection of the Rule:

> "Bishop alleged that the Offering Circular contained material misrepresentations and failed to state material facts necessary to make the statements made not misleading. At the same time, he admitted that he never read or otherwise relied on the Offering Circular. If the *Ute* presumption applies to these nondisclosures, Bishop's admission rebuts it. Bishop's claim that he was deceived by the misrepresentations and omissions of the Offering Circular was correctly dismissed by the district court because of his failure to read or even seek to read the Offering Circular."

*Shores* at 468.[16]

The Court divided sharply over whether the dismissal of the 10b–5(2) claim based on lack of reliance on the Offering Circular also controlled disposition of the claims made under 10b–5(1) and (3). A twelve judge majority held that Bishop's admitted lack of reliance was not determinative as to claims made under 10b–5(1) and (3). *Id.* at

469. The Court reversed the district court's dismissal as to those claims and remanded, instructing that Bishop be given the opportunity to prove that the defendants conspired to bring to market securities that were not entitled to be marketed, that he relied on the bonds' availability in the market as an indication of their genuineness, and that as a result of the scheme to defraud he suffered a loss. *Id.* at 469–70. Focusing on the language of Rule 10b–5(1) and (3), the first and third subsections, the Court noted that these provisions would allow Bishop to show a scheme to defraud or course of business which operates as a fraud. It is important and instructive to note the Court concluded:

> "Whenever the rule 10b–5 issue shifts from misrepresentation or omission in a document to fraud on a broader scale, the search for causation must shift also. The 'reliance' that produces causation in the latter type of case cannot come from reading a document.... rule 10b–5 is not limited to a narrow right to recover for knowing fraudulent misrepresentations or omissions in disclosure documents which mislead a securities buyer. The rule is recognized also to provide the basis for a federal cause of action for more elaborate, intentional schemes which deceive or defraud purchasers of securities."

*Id.* at 472.

We hold, therefore, that *Shores* permits a plaintiff to assert a fraud on the market theory under 10b–5(1) and (3) but not under 10b–5(2). This conclusion is consistent not only with the language of *Shores,* but with the *Shores* result- -reversal as to the dismissal of claims under 10b–5(1) and (3) and affirmance as to the dismissal of claims under 10b–5(2). Other Circuits have gone even farther, and recognize the fraud on the market theory under

---

16. *See also Shores* at 481 (Randall, J., dissenting). ("In this case the existence of reliance has been definitively disproved by Bishop's admission that he did not read or even seek to read the offering circular. And, as the majority opinion correct [sic] concludes, presumptive reliance has been rebutted by the same admission."

10b–5(2).[17] We do not because *Shores* does not.[18]

It is clear, then, that courts deciding whether a fraud on the market claim is viable must first characterize the allegations of the complaint as falling under 10b–5(1) and (3), and not under 10b–5(2). This is not, however, a task for which there is no guide. As we have discussed, the process of characterizing a complaint in this fashion springs from the Supreme Court's holding in *Affiliated Ute*, and was discussed in *Rifkin v. Crow*.[19]

## V. THE COMPLAINT AND *SHORES v. SKLAR*

■ Turning to plaintiff's complaint, we find that it tracks the language of all three subsections of Rule 10b–5.[20] Under *Shores*, any fraud on the market claim under subsection (2) is barred by plaintiff's failure to allege that she read or relied on any of the documents now claimed to have misrepresented the financial condition of Docutel. As to claims under Rule 10b–5(2), therefore, we affirm the district court's dismissal of the complaint.

■ But the fact that the complaint lists a number of documents filed with the SEC does not limit plaintiff's claim to subsection (2) only. For, as in *Shores*, plaintiff's lack of reliance on these documents does not resolve the claims made under 10b–5(1) and (3). We find that plaintiff's complaint properly alleges a scheme to defraud or course of business operating as a fraud for purposes of the first and third subsections; plaintiff's complaint, taken as a whole, al-

leges that Olivetti forced Docutel to take its worthless inventories, that this scheme or course of business was not disclosed, and that the effect was to defraud certain purchasers of Docutel. That is the core of this case on remand: whether Olivetti forced Docutel to take worthless inventories and whether the alleged nondisclosure of that fact inflated the stock price and caused the damages complained of.

■ The fact that plaintiff's complaint lists inaccuracies in Docutel's three quarterly filings with the SEC does not mean plaintiff's complaint fails completely. It fails only under the 10b–5(2) claim. Issuers of securities are under a continuing obligation to make disclosure. Because of the continuing obligation to make disclosure, "it is difficult to envision a pure case of nondisclosure when the issuer is a publicly reporting company, since the failure to make complete disclosure would make prior statements misleading".[21] The fact that Docutel complied with its obligation to file form 10–Qs with the SEC cannot limit all plaintiffs to relief only under 10b–5(2). The presence of disclosure documents may prevent this from being a case of pure nondisclosure; it does not, however, prevent this case from being primarily one of nondisclosure, as in *Affiliated Ute*. The most significant event which allegedly led to the loss by plaintiff is the claim that Olivetti forced Docutel to take worthless inventories without disclosing that fact in the market place; if proved, that conduct could equate with a scheme to defraud or

**17.** *See Peil v. Speiser*, 806 F.2d 1154, 1162–63 (3d Cir.1986) (fraud on the market theory pertains to Rule 10b–5(b) claims as well as claims brought under clauses (a) and (c)); *Lipton v. Documation, Inc.*, 734 F.2d 740 (11th Cir.1984) (adopting fraud on the market theory as to all claims under 10b–5); *Blackie v. Barrack*, 524 F.2d 891 (9th Cir.1975).

**18.** We disagree with the holding of *Lipton* to the extent that it reads *Shores* to permit a fraud on the market theory under 10b–5(2). We note, however, that we find its reading of *Shores* otherwise consistent with our own.

**19.** See 574 F.2d 256, 263.

**20.** Plaintiff's complaint alleges:

"26. Throughout the class period, defendants, pursuant to a common course of con-

duct or conspiracy and using the means and instrumentalities of interstate commerce (including the United States mails), knowingly and/or recklessly (a) employed devices, schemes and artifices to defraud; (b) omitted to state material facts necessary in order to make the D/O statements made in light of the circumstances in which they were made not misleading; and (c) engaged in acts, practices and a common course of business which operated as a fraud or deceit upon plaintiff and the class as hereinafter alleged."

**21.** Grzebielski, *Should the Supreme Court Recognize General Reliance in Private Actions under Rule 10b–5?*, 36 Baylor L.Rev. 335, 339 n. 23 (1984).

course of business operating as a fraud in violation of 10b–5(1) and (3). Thus, we conclude that the district court erred in its dismissal of the complaint as to plaintiff's claims under 10b–5(1) and (3).[22]

On remand, Finkel will not be limited to proof that the securities were "unmarketable" because of the defendants' alleged fraud. The instruction to the lower court in *Shores* that "[i]f Bishop proves no more than that the bonds would have been offered at a lower price or higher rate, rather than that they should never have been issued or marketed, he cannot recover" (*Shores* at 470) was tailored to the facts of that case.[23] Although there was some doubt in *Shores* about whether Bishop purchased in the primary market as an initial purchaser from the offering, or in the secondary market,[24] it is clear that the market for the bonds in *Shores* (industrial development bonds of the town of Frisco City, Alabama) does not represent the active, efficient market for which the fraud on the market theory was initially conceived. (As noted in *Shores*, bonds of that type are usually not traded in a secondary market. *Id.* at 467). In contrast, Docutel's stock traded in the over-the-counter market.[25] The critical fact is the presence of a market in which the security is actively traded.[26] The *Shores* limitation of Bishop's claim to proof that the bonds were unmarketable is simply a rule formulated for newly issued securities. We pause to examine that statement because it more sharply focuses the holding of *Shores:* The process of issuing securities is different from the process of valuing securities; the issuance price is set, not by market forces, but by the issuer and managing underwriter.[27] While the price is related to the market's valuation process because the underwriter and issuer set the price in relation to the market price of similar securities already in the market, the causal nexus between price and market is not direct.[28] The majority in *Shores* simply recognized that a Rule 10b–5 action based on the fraud on the market theory could embrace a claim for a fraud that resulted in the issuance of worthless securities as well as a fraud that inflated the price of a security.[29]

On remand, defendants will have an opportunity to rebut the presumption of reliance established by proof of materiality of the alleged misconduct, if plaintiff can show materiality. Defendants may do so in two ways: 1) by showing, upon the shifting of the burden to defendant, that the nondisclosures did not affect the market price; or 2) that plaintiff would have purchased the stock at the same price even if

**22.** The dissent in *Shores* argued that the requirement of positive proof of reliance under 10b–5(2) is a "dead letter" if a plaintiff can use the broad language of 10b–5(1) and (3) to reach conduct that is also actionable under 10b–5(2). *Shores* at 486 (Randall, J., dissenting). The *Shores* majority rejected that argument. *See Shores* at 471–72. We, bound by *Shores*, also reject it.

**23.** The distinction between facts that decrease the value of securities and facts that make securities unmarketable has drawn some criticism. *See* Note, 90 Harv.L.Rev. 1143, 1158 (limitation to totally unmarketable securities is arbitrary); Black, N.C.L.Rev. 435, 453 (distinction is, if there is one, difficult to draw); Grzebielski, 36 Baylor L.Rev. 335, 341.

**24.** The district court found that Bishop purchased from the primary offering, and the *Shores* majority did not purport to reverse that finding. *Shores* at 467.

**25.** Appellees imply that the fact that Docutel traded in the OTC market, which is not an exchange like the New York or American stock exchanges, and the number of Docutel shareholders (3200) support the district court's ruling. These facts may have some relevance to determining whether the market for Docutel's stock was efficient, but that issue is not before us. If plaintiff can establish materiality of the misconduct, and through it a presumption of reliance, defendants may rebut the presumption by showing that the market did not react to the alleged fraud.

**26.** *Lipton*, 734 F.2d at 746 n. 8; *T.J. Raney & Sons, Inc. v. Fort Cobb, Oklahoma, Irrigation Authority*, 717 F.2d 1330, 1332.

**27.** *See* Note, *Fraud on the Market: An Emerging Theory of Recovery under SEC Rule 10b–5*, 50 Geo.Wash.L.Rev. 627, 651 & n. 137 (1982).

**28.** *Lipton* at 746.

**29.** The Court mentioned *Rifkin v. Crow* for the proposition that a 10b–5 claim under subsections (1) and (3) would be viable where the plaintiff alleged "a scheme to inflate common stock prices by misleading statements." *Shores* at 472.

she had known the information that was not disclosed, or that she actually knew the information that was not disclosed to the market.[30]

## VI. CONCLUSION

We need not address, point by point, appellees' numerous arguments against the fraud on the market theory in general. Simply stated, the fraud on the market theory has been widely accepted by impressive scholars and many courts. Appellees' only remaining argument, that the district court's dismissal of the complaint may be affirmed because the complaint does not plead fraud with particularity, is unavailing at this point. The district court did not rule on defendants' motion to dismiss under Fed.R.Civ.P. 9(b) and defendants may re-urge it on remand.

The judgment dismissing plaintiff's complaint is vacated to the extent stated herein, and the cause is remanded for further proceedings consistent with this opinion on the issue of whether the alleged failure to disclose the purchase of inflated inventories entitles plaintiff and the class, if one is certified, to recover damages under 10b–5(1) and (3).

---

**30.** *Peil v. Speiser,* 806 F.2d 1154, 1163; *Blackie v.*    *Barrack,* 524 F.2d 891, 906.